## PYRAMID DRILLING CO. et al. v. HOWELL.

### No. 6038.

Court of Civil Appeals of Texas. Texarkana.

June 9, 1943.

Rehearing Denied June 24, 1943.

Israel Smith, of Tyler, for appellants.

Mayfield, Lee & Lantz, of Tyler, J. S. Grisham, of Dallas, and John D. Glass, of Tyler, for appellee.

HALL, Justice.

On or about December 6, 1939, John R. Bunn borrowed $6,000 from appellee, Wm. S. Howell, Jr., giving as security therefor a chattel mortgage on his oil drilling rig No. 3, located in Yazoo County, Mississippi. The mortgage designated the property covered by it as drilling rig No. 3 and in addition thereto described the component parts of said drilling rig. At the time the mortgage was given Bunn owned three other drilling rigs. As additional security Bunn assigned to Howell two "bottom-hole" letters, one from Hill & Hill and the other from W. L. Stewart, each in the sum of $3,000. These bottom-hole letters had reference to a well to be drilled by Bunn with rig No. 3 in Yazoo County, Mississippi. The bottom-hole letters or assignments were later released, as well as the original mortgage on said rig, as an accommodation to Bunn, without any part of the debt having been paid. On or about March 20, 1940, Bunn entered into a contract with Roser & Pendleton to drill a well for oil in Humphries County, Miss. He assigned to Howell $6,000 of the amount to become due from Roser & Pendleton and also executed a new mortgage covering the same drilling rig which provided for payment by July 1, 1940, with interest from date at the rate of 6% per annum. This mortgage was promptly recorded in Humphries County, Miss. Howell received under this assignment from Roser & Pendleton the sum of $3,500 and released the remaining $2,500 to Bunn as an accommodation to him. This left a balance of $2,500 with interest due Howell by Bunn, and which amount forms the basis of this suit.

In August, 1940, Bunn removed drilling rig No. 3 from Mississippi to Anderson County, Texas, for drilling operations, and on August 13, 1940, Howell recorded his chattel mortgage in Anderson County. On May 13, 1941, Bunn, together with L. M. Temple, Sr., his drilling superintendent, and G. A. Crafton, his bookkeeper and income tax consultant, to both of whom Bunn was indebted in the approximate sum of $2,000 and $1,000 respectively, made application to the Secretary of State for a charter for the Pyramid Drilling Company. On May 16, 1941, the charter was granted and on May 18, 1941, Bunn transferred by bill of sale to the Pyramid Drilling Company, as its sole assets, drilling rig No. 3, specifically describing the several items constituting said rig, which description is different in some respects from that listed in the mortgage given by Bunn to Howell on March 20, 1940. Crafton received ⅛ and Temple ⅖ of the stock of Pyramid Drilling Company in satisfaction of Bunn's indebtedness to them, and Bunn received the remaining ⅝ of the capital stock of the company. They constituted its officers and directors. Bunn became president, Temple vice-president, and Crafton secretary and treasurer. At the time drilling rig No. 3 was transferred to Pyramid Drilling Company it was located in Anderson County where Howell's mortgage was of record. Later Pyramid Drilling Company removed drilling rig No. 3 to Louisiana for drilling operations. The rig remained in Louisiana until this suit was instituted.

Certain of the appellants, referred to in this record hereafter as the Bunn creditors, had secured judgments against Bunn for debts owing by him in excess of $5,000. On October 17, 1941, Bunn assigned his ⅝ of the capital stock of the Pyramid Drilling Company to Israel Smith, an attorney of Tyler, Texas, as Trustee for the Bunn creditors as security for their claims. Shortly afterwards Smith was made president and director of the Pyramid Drilling Company. Temple and Crafton continued to hold their stock and offices in the corporation. The assignment to Smith, Trustee, provided that Bunn was to pay a certain amount of money each month thereafter until the indebtedness owing these creditors was paid. It was also provided in said assignment that in default of two payments Smith, Trustee, could mature the whole obligation. Bunn defaulted in his payments to Smith and the drilling rig was sold by Smith on January 10, 1942, to R. T. Myers and C. D. Davis, the highest bidders, for $7,200 cash, which amount, less certain labor and tax claims, was divided

among the Bunn creditors and Temple and Crafton in the proportion of the amount of stock of the Pyramid Drilling Company held by each bore to the whole. That is, Israel Smith, Trustee, received for the Bunn creditors ⅝ of the net amount, Crafton ⅛, and Temple ⅔. Howell did not participate in either the sale of the drilling rig No. 3, which constituted practically the entire assets of the drilling corporation at the time, or the division of money derived therefrom. He had no knowledge of the transfer of drilling rig No. 3 by Bunn to the Pyramid Drilling Company until the latter part of August 1941. At that time he used due diligence, ineffectual however, to protect his collateral. When Howell learned of the sale of drilling rig No. 3 and that the proceeds therefrom had been distributed among the Bunn creditors and Crafton and Temple, he immediately instituted this suit against Bunn, Crafton, Temple, the Bunn creditors, Pyramid Drilling Company, and Myers and Davis for his debt and to foreclose his mortgage lien on drilling rig No. 3, and for conversion of same. He sought judgment against each of said parties jointly and severally for the amount of his debt remaining unpaid, interest and attorney's fee, which amounted to a sum in excess of $3,000. At the conclusion of the evidence the trial court instructed the jury to return a verdict for appellee, Howell, against the appellants herein, jointly and severally, and in favor of Myers and Davis under their plea of innocent purchaser for value. The Bunn creditors and Temple and Crafton have filed separate briefs.

■ By their Point 1, the Bunn creditors assert that "the court erred in instructing the jury to return a verdict against appellants since knowledge of the mortgage had by Bunn could not be imputed to the Pyramid Drilling Company, Inc., which was incorporated fourteen months later." This point presents the same issue advanced by Temple and Crafton under their Point 5.

We think it clear from the undisputed facts in this record as stated by the trial court in his instructions to the jury, that Bunn was the principal figure in the organization of the Pyramid Drilling Company. Drilling rig No. 3, Bunn's property, constituted its total capital assets. Upon this property alone was issued the 1,000 shares of its capital stock. It is true that Crafton and Temple, employees of Bunn

and to whom Bunn was indebted joined him in organizing the corporation and received ⅛ and ¼ of its capital stock, respectively, in payment of a preexisting debt owing them by Bunn, but until the corporation assigned the stock to Crafton and Temple, Bunn owned its entire capital stock by virtue of his prior ownership of the total assets against which the stock was issued. There is no dispute but that Bunn, the mortgagor, had actual knowledge of the existence of the chattel mortgage covering drilling rig No. 3, as well as the oral agreement between himself and appellee, Howell, that the drilling rig would be kept in good state of repair and that necessary additions and replacements would be made by him. Under these circumstances, such knowledge on the part of Bunn, the promoter, was imputed to the Pyramid Drilling Company. It was in no wise an innocent purchaser or holder of said drilling rig for value. It simply took the drilling rig as its capital assets subject to both the written lien and the verbal agreement with respect to additions and replacements. Mays v. First State Bank of Keller, Tex.Com.App., 247 S.W. 845; Simmons Creek Coal Co. v. Doran, 142 U.S. 417, 12 S.Ct. 239, 35 L.Ed. 1063; Cook on Corporations, 6th Ed., Vol. 3, § 727, pp. 2371–2373. The transfer of drilling rig No. 3 by Bunn to the corporation did not affect the validity of appellee's lien. The mortgage covering the drilling rig constituted a contract between Bunn and appellee fixing said lien. 18 C.J.S., Corporations, § 143, subdivision (2), p. 546. The drilling corporation was the alter ego of Bunn—it merely stepped into his shoes. Or, as said by a noted jurist, "put on his coat." These points are overruled.

■ The second point relied on by Bunn creditors is: "The court erred in instructing the jury to return a verdict against appellants, since the equipment described in the mortgage and the property bought by the Pyramid Drilling Company were entirely separate and distinct." This point raises the same question advanced by Crafton and Temple in their 4th point. Bunn, a defendant, and appellee, Howell, plaintiff in the court below, each testified to an understanding between them prior to the organization of the Pyramid Drilling Company to the effect that Bunn would at all times keep drilling rig No. 3 in repair by substitutions, additions and replacements. This testimony coming as it did from opposing parties to this suit, in no

wise contradicted by any witness, rendered unnecessary any finding of fact with respect thereto. So, as between Bunn and appellee, Howell, and between the Pyramid Drilling Company and Howell under our previous holding, the chattel mortgage executed by Bunn in favor of appellee on March 20, 1940, and the oral agreement between them with respect to additions, replacements and keeping the drilling rig in repair, under the undisputed evidence, would cover and include drilling rig No. 3 as constituted at the time it was assigned by Bunn to the Pyramid Drilling Company. The oral agreement did not change or alter the terms of the written mortgage, but is more in the nature of a verbal mortgage as a guarantee by Bunn to protect and keep in existence the chattel covered by the written mortgage, namely, drilling rig No. 3. Leeds v. Reed, Tex.Civ.App., 36 S.W. 347. Indeed it has been held that the effect of a written mortgage is to cover after-acquired machinery adapted to a mortgaged manufacturing plant. National Bank of Sturgis v. Levanseler, 115 Mich. 372, 73 N.W. 399; Smith v. Blake, 96 Mich. 542, 55 N.W. 978; Jones on Mortgages, 6th Ed., Vol. 1, § 444, p. 408. These points are overruled.

As said before, Israel Smith, as Trustee for the Bunn creditors and as president of Pyramid Drilling Company, sold drilling rig No. 3 to Davis and Myers and divided the funds thus received, less certain expenses, among appellants. The claims of appellants to this fund were based upon preexisting debts due them by Bunn. There was no new or additional consideration furnished by them at the time they received payment of their debt out of the funds derived from the sale of the drilling rig. In such circumstances it cannot be said that they received payment in good faith. Their claims upon the drilling rig or the proceeds derived from its sale were inferior to that of appellee, the owner and holder of the mortgage lien upon same. Anglin v. Cisco Mtg. & Lien Co., 135 Tex. 188, 141 S.W.2d 935, and cases there cited, including Walter Connally & Co. v. Gaston, 295 S.W. 953, by this court. See, also, 43 T.J., § 377, p. 638.

We have examined all other points advanced by appellants, they are thought to be without merit and are respectfully overruled.

The judgment of the trial court is affirmed.

## On Motion for Rehearing.

Appellants, represented by the Hon. Israel Smith, have filed motion for rehearing in which it is earnestly insisted that the court erred in holding that Bunn's knowledge of the existence of the oral mortgage in favor of Howell was imputed to the Pyramid Drilling Corporation and as authority therefor they cite Weatherford, etc., Rwy. Co. v. Granger, 86 Tex. 350, 24 S.W. 795, 40 Am.St.Rep. 837, and Godley Lumber Co. v. Teagarden, Tex.Civ.App., 135 S.W. 1109, 1114, affirmed by Supreme Court 105 Tex. 616, 154 S.W. 973.

A careful reading of the above cases will convince one that they are not in point. In the first case the main question involved was the contract made by one of the promoters with Granger whereby Granger was to assist the promoters in securing a bonus for the proposed railway corporation. The question of notice was only incidental. Justice Gaines, speaking for the court [86 Tex. 350, 24 S.W. 797, 40 Am.St.Rep. 837], said:

"Here a proposition was made on behalf of the company, by its promoters, that if a bonus should be subscribed and paid to it, it would build its road between certain points, and would carry coal at a certain stipulated rate. By accepting the bonus, the company became bound to fulfill the stipulations of that contract. That was the burden which it took with the benefit of the agreement. But it also appears that one of the promoters promised the plaintiff that if he would assist in procuring subscribers to the bonus the company would pay him for his services. This was no part of the contract the benefits of which were taken by the defendant. * * *

"* * * He made his contract before the company had a legal existence as a corporation, with a single promoter; and it is a matter of no moment that the promoter was the general manager of the project, and became the owner of the majority of the stock upon its organization. There were other stockholders. The law requires that there should be 10 at least. Rev.St. art. 4099. The evidence does not disclose that his contract with Anderson was actually known to any other person, nor do we see any other circumstance from which knowledge should necessarily be inferred. Since Anderson had no power to bind the future corporation, but could bind himself, the inference from his assisting Anderson would be that he was acting

gratuitously, or that Anderson had agreed to pay him. Anderson was interested in shifting his contract upon the company, and it may be doubted whether, although he became a director, notice to him could be deemed notice to the company."

Thus it is apparent that this case turns on the contract between Anderson and Granger. No benefits therefrom accruing to the corporation, it was held not to be bound. And in Godley Lumber Company case cited last above, it appears that while Godley was an officer of the Coleman Lumber Company he sold to said company certain timber lands, an interest in which was claimed by Teagarden. It was held that, "When, however, the officer or agent is personally interested in the transaction adverse to the corporation, as in a sale by himself to the corporation, he is held not to be the representative of the corporation; and, it being to his personal interest to conceal defects in his title, the presumption that he communicated such defect to the corporation does not obtain. * * * It is wholly immaterial what official position R. B. Godley held in the Coleman Lumber Company, or how much of the stock he held when he sold the land to the Coleman Lumber Company. His position as vendor was adverse to, and not representative of, the corporation as vendee." Godley was not the alter ego of the Coleman Lumber Company. "The evidence shows [continues the opinion] that the Coleman Lumber Company was duly organized with a president and secretary and board of directors, and was conducting its business in the usual way, and while so operating its affairs that C. C. Slaughter, Jr., bought $10,000 of stock in that company, and paid that much cash to the company, and became the owner of stock therein equal to the number of shares owned by R. B. Godley."

The facts in the case at bar show that Bunn alone owned drilling rig No. 3, the total assets of Pyramid Drilling Company, and upon which was issued all its stock. Bunn, of course, knew of his financial arrangements with Howell and of the lien held by Howell against drilling rig No. 3, when he organized the Pyramid Drilling Company and assigned to it drilling rig No. 3. The undisputed evidence in this record establishes that Pyramid Drilling Company was nothing more nor less than the alter ego of Bunn. As before stated, it merely "stepped in his shoes" in all matters respecting drilling rig No. 3. To hold otherwise, in our opinion, would per-

mit one under the circumstances here established to effectively place his property beyond the reach of his creditors.

The motion further asserts that the court erred in holding that the testimony with respect to substitutions, additions, and replacements to drilling rig No. 3 was "in no wise contradicted by any witness." In reinvestigating this case, we have reread the testimony of both Bunn and Howell with respect to this phase of same, and have concluded that our statement set out above is substantially correct. When all the testimony of these two witnesses is carefully read and considered, no dispute between them arises with respect to replacements, additions and substitutions to said drilling rig so as to keep it intact and in working order.

The other parts of said motion have been considered and are thought to be without merit. Appellants' motion for rehearing is respectfully overruled.