**GULF OIL CORPORATION, Appellant,**

v.

**LONE STAR PRODUCING COMPANY,**
**Appellee.**

**No. 20005.**

United States Court of Appeals
Fifth Circuit.
Aug. 13, 1963.

Fred A. Lange, W. B. Edwards, Houston, Tex., for appellant.

Roy E. Pitts, Archie D. Kroney, D. L. Case, Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., Jack T. Life, Athens, Tex., for appellee.

Before HUTCHESON, RIVES and GEWIN, Circuit Judges.

RIVES, Circuit Judge.

By written contract of April 1, 1958, Gulf Oil Corporation (hereafter Gulf Oil) agreed to purchase and Lone Star Producing Company (hereafter Lone Star) agreed to sell certain crude oil described as Lone Star's "owned and controlled production from Opelika and LaRue Fields (currently approximately six hun-

dred (600) barrels daily)." The agreement was to "remain in effect until canceled by either party giving to the other party thirty (30) days' written notice of cancellation." Deliveries were to be made from tankage "at such times and in such quantities as may be mutually agreeable." Gulf Oil was to pay Lone Star monthly "for all crude oil delivered during the preceding calendar month" at "a price per barrel equal to Gulf Oil Corporation's Northeast Texas Area posted price for the gravity received in effect on the date which said crude oil is allocated for pricing purposes, less any transportation cost in excess of five (5) cents per barrel as stipulated in pipe line tariffs of Gulf Refining Company for transportation of the crude oil to its Big Sandy Station."

During the entire period of the contract the applicable posted price was $3.15 per barrel. From May 8, 1958 the pipe line tariffs of Gulf Refining Company [1] for transportation of crude oil from lease tankage in Opelika Field to Big Sandy Station stipulated a rate per barrel of 15 cents. In each of the 31 months from May 1958 through November 1960, Gulf Oil paid Lone Star for oil delivered under the contract the full posted price of $3.15 per barrel without any deduction for transportation cost. On January 4, 1961, Gulf Oil wrote to Lone Star as follows:

"Contract dated April 1, 1958, under which Gulf purchased your La-Rue and Opelika production, provides that Gulf Oil Corporation's posting for North East Texas Crude shall be reduced by any transportation cost in excess of five (5) cents per barrel as stipulated in pipe line tariffs of Gulf Refining Company presently in effect. On May 8, 1958 Gulf Refining Company issued Tariff No. 163 which provided for a rate of fifteen (15) cents per barrel on the movement of this crude. At this time, the price paid to you should have been decreased ten (10) cents per barrel. However, this decrease in price was inadvertently overlooked in our accounting to you.

"We are attaching our Invoice No. 0-12-X in the amount of $44,522.33 representing ten (10) cents per barrel overpayment for the period May 9, 1958 through November 30, 1960.

"This invoice shows in detail the runs which were incorrectly valued. We wish to apologize for any inconvenience caused you by our improper accounting, and would appreciate your reimbursing us for this overpayment in order that we may reconcile our records."

Gulf Oil then refused to pay Lone Star for the oil purchased during December 1960 without deducting the total amount of such claimed overpayment, and tendered the balance which it claimed to be due of $4,649.01. Lone Star refused to accept.

On December 15, 1961, Lone Star filed its complaint against Gulf Oil to recover for the oil sold during December 1960 at the price of $3.15 per barrel. Gulf Oil answered, denying such indebtedness but admitting the obligation for the December 1960 oil at the price of $3.05 per barrel and praying "that any recovery by the Plaintiff under the terms of the contract of April 1, 1958 be made subject to the ten cents per barrel transportation rate increase provided for in said contract." Gulf Oil also filed a counterclaim praying for judgment against Lone Star in the amount of the claimed overpayments of $44,522.33, or that it be deducted from and allowed as an offset against the acknowledged indebtedness of $49,171.34 for December 1960 crude oil purchases.

The case was tried to the court without a jury. The district court, in a full opinion reported at 208 F.Supp. 85, held that "the price Gulf Oil, under the contract in question, was required to pay Lone Star for the oil it purchased from it during the existence of said contract, including the oil purchase during the month of December 1960, was the applica-

---

1. I.C.C. No. 44 and Texas Local Tariff No. 163.

ble posted price per barrel for said oil, less 10¢ per barrel." Accordingly, the district court restricted Lone Star's recovery for the December 1960 oil to the $3.05 contract price. As to the oil delivered during the preceding 31 months, however, the district court permitted Lone Star to retain the overpayments totaling $44,522.33, upon a holding that Gulf Oil had "voluntarily" paid the money to Lone Star "with full knowledge of all the facts." In the alternative, the district court ruled that recovery of $31,-298.26 was barred by the Texas two-year statute of limitations.[2]

We disagree with both rulings and reverse and remand for a recomputation at the $3.05 contract price and the making of certain equitable adjustments.

### The Contract Price.

■ There is no question but that, under the provisions of the contract of April 1, 1958, which have been quoted, the contract price was $3.15 per barrel "less any transportation cost in excess of five (5) cents per barrel as stipulated in pipe line tariffs of Gulf Refining Company for transportation of the crude oil to its Big Sandy Station."

The district court found that:

"Although the evidence does not show under which Tariff Gulf Refining Company charged Gulf Oil it did charge Gulf Oil and Gulf Oil paid 15¢ for each barrel of oil Gulf Refining Company moved or transported from Lone Star's Opelika Plant to Gulf Refining Company's Big Sandy Station from May 8, 1958, through December 1960. The 15¢ per barrel so charged Gulf Oil by Gulf Refining Company was a transportation cost within the meaning of the pricing clause of the April 1, 1958, contract between Gulf Oil and Lone Star above quoted * * *."

The district court thought that the crude oil moved in interstate commerce and that the applicable tariff was Gulf Refining Company's I.C.C. No. 44, filed May 6, 1958. Lone Star does not question the validity of Tariff I.C.C. No. 44 or that it was effective at all pertinent times, but contends that the oil did not move in interstate commerce.

Lone Star contended in the district court that Texas Local Tariff No. 163 was not filed until June 28, 1961. The district court found:

"This contention of Lone Star is without merit. Under the finding above made to the effect that said Tariff No. 163 was received by the Railroad Commission of Texas on May 8, 1958, for filing and thereafter remained in the office of the Railroad Commission, said Tariff was filed with the Railroad Commission on May 8, 1958, even though for some reason the Railroad Commission did not formally place the file mark thereon until June 28, 1961."

Lone Star also contended in the district court that if Texas Local Tariff No. 163 is applicable, it provides for a gathering charge and not a transportation charge. In response to that contention, the district court held:

"The transportation cost, referred to in said quoted paragraph of said contract can have but only one meaning and that is the amount Gulf Refining Company charged Gulf Oil for moving or transporting the oil from Lone Star's Opelika Plant to Gulf Refining Company's Big Sandy Station, and that is true irrespective of whether such, under the rules and regulations of the Railroad Commission of Texas, is to be considered a charge for gathering of oil or a charge for transporting oil."

On appeal Lone Star makes a third contention, that both tariffs apply only to "lease tankage" in Opelika Field to Big Sandy Station. It insists that "lease tankage" refers to the tanks into which the flow lines from the wells on the lease are directed. Its insistence continues:

"In this case, the oil produced from Opelika Field was gathered from

---

2. Article 5526, Vernon's Civil Statutes of Texas.

'lease tankage' into storage tanks by Lone Star, not by Gulf Oil or Gulf Refining (R. 141), and the oil from the LaRue Field was accumulated by a gathering system into central storage in LaRue Field, from which it was hauled by trucks to the storage tanks at Opelika Field. (R. 141–142.) From the storage tanks, the oil was pumped into Gulf Refining's pipelines. (R. 1–142.) Thus, it is undisputed that the oil in this case did not move from 'lease tankage' in Opelika Field to Big Sandy Station and these tariffs simply do not apply to it."

The contract of April 1, 1958 contained the following provision:

*"DELIVERY:* The crude oils sold and purchased hereunder shall be delivered by Lone Star Producing Company from tankage at its Opelika Plant into facilities of Gulf Refining Company for the account of Gulf Oil Corporation. Deliveries shall be made at such times and in such quantities as shall be mutually convenient. Title to the crude oil sold and purchased hereunder shall pass to Gulf Oil Corporation upon delivery into the above-mentioned facilities of Gulf Refining Company."

Both tariffs applied: "FROM Lease tankage within the territory of the Gulf Refining Company's gathering facilities in Opelika Field, Henderson County, Texas, TO Big Sandy Station, Upshur County, Texas." We think that the tariffs were applicable whether the tankage from which the oil was delivered into the facilities of Gulf Refining Company belonged to Lone Star or to Gulf Oil. It actually cost Gulf Oil 15 cents per barrel to transport the crude oil to its Big Sandy Station. Lone Star does not suggest any tariff which would provide a lower cost of transportation. We are in agreement with the district court's finding that the contract price was $3.05 per barrel.

**Voluntary Payment.**

While the contract price was $3.05 per barrel, for the 31 months from May 1958 through November 1960 Gulf Oil paid Lone Star at the rate of $3.15 per barrel, or total overpayments of $44,522.33.

Gulf Oil does not and cannot dispute the principle that, even though it was under no legal obligation to make the overpayments, if the money was voluntarily paid, with full knowledge of all the facts, it cannot be recovered.[3]

For that principle to apply, however, the overpayments must have been truly voluntary, that is, "done by design or intentionally or purposely or by choice or of one's own accord or by the free exercise of the will." Prigmore v. Hardware Mutual Ins. Co., Tex.Civ.App.1949, 225 S.W.2d 897, 899. There must appear "an intention on the part of the payor to waive his rights." West Texas State Bank v. Tri-Service Drilling Co., Tex.Civ.App.1960, 339 S.W.2d 249, 253. See also, 40 Am.Jur. Payment, § 159, p. 823; 70 C.J.S. Payment § 134, pp. 343, 344.

Money paid under a mistake of fact can be recovered. 70 C.J.S. Payment § 157, pp. 367, et seq. As said in 44 Tex. Jur.2d Payment, § 77, p. 750: "It is a general rule that money paid under a mistake of fact, that is, an unconscious ignorance or forgetfulness of a fact, may be recovered."

The fact that the payor was negligent, or was carelessly ignorant of the facts as to which he was mistaken does not necessarily bar recovery, but may be considered in determining the equities between the parties and may reduce the amount of recovery. See A.L.I. Restitution, § 18c, p. 84, §§ 150–159. As said in Edwards v. Trinity & B. V. Ry. Co., 1909, 54 Tex.Civ.App. 334, 118 S.W. 572, 576:

" * * * it has sometimes been said in very general terms that a mistake resulting from the complaining

3. See Pitts v. Elser, 1894, 7 Tex.Civ.App. 47, 32 S.W. 146; Gibson v. General American Life Ins. Co., 1936, Tex.Civ. App., 89 S.W.2d 1070; Wheeler v. Metteauer, 1955, Tex.Civ.App., 283 S.W.2d 95.

party's own negligence will never be relieved. This proposition is not sustained by the authorities. It would be more accurate to say that where the mistake is wholly caused by the want of that care and diligence in the transaction which should be used by every person of reasonable prudence, and the absence of which would be violation of legal duty, a court of equity will not interpose its relief; but even this more guarded mode of statement, each instance of negligence must depend to a great extent upon its own circumstances. It is not every negligence that will stay the hand of the court. The conclusion from the best authorities seems to be that the neglect must amount to the violation of a positive legal duty. The highest possible care is not demanded. Even a clearly established negligence may not of itself be a sufficient ground for refusing relief, if it appears that the other party has not been prejudiced thereby."

Further, as said in 44 Tex.Jur.2d Payment, § 77, pp. 752, 753:

"The mere fact that the mistake was due to negligence on the part of the person who made the payment will not preclude a recovery. The payor may recover though he had the means of knowing the facts at the time, where he did not have actual knowledge of them, unless the payment was made intentionally and in circumstances showing a determination to pay without choosing to investigate the facts. Negligence in paying does not give the payee the right to retain what was not his due, unless he was misled or prejudiced by the mistake."

The district court took the position that the burden of proof rested on Gulf Oil to show that the overpayments were made by mistake of fact and that Gulf Oil had not met that burden, because "No one from Gulf Oil's Accounting Department, the department responsible for the overpayment, was called to testify as to the reason for the overpayment." We agree that the payor Gulf Oil had the burden to prove that the overpayments were induced by mistake of fact. See 44 Tex. Jur.2d Payment, § 84, p. 761. Under the circumstances of this case, however, that was not a very heavy burden. As shown in our discussion, *ante*, under the caption "The Contract Price," the correct price was $3.05 per barrel, and while Lone Star makes several contentions to the contrary, they are not very substantial. There was simply no explanation for the overpayments except that they were made by mistake of fact.

Gulf Oil's letter of January 4, 1961 calling attention to the mistake frankly conceded that it was caused "by our improper accounting," and said: "At this time, the price paid to you should have been decreased ten (10) cents per barrel. However, this decrease in price was inadvertently overlooked in our accounting to you."

The manager of Gulf Oil's crude oil supply, J. G. Coates, testified:

"We discovered that we, in error —that is, Gulf Oil Corporation had, in error, during the duration of this contract paid Lone Star improperly three-fifteen rather than the correct three zero five. Therefore, we owed them for December in the amount of, oh, approximately fifty thousand dollars. We had overpaid them approximately forty-five thousand dollars —forty-four or forty-five thousand —so, we withheld the fifty thousand and tendered them the remaining approximately five thousand dollars; because it was a definite error and it seem (sic) no argument at all. There had merely been an error in performance there; and, therefore, we called it an overpayment—which was an overpayment in the terms of the executed contract."

■ There was no evidence to the contrary. Under the circumstances of this case, we think that Gulf Oil sufficiently met its burden and, indeed, that the evi-

dence is undisputed that the overpayments were made under a mistake of fact.

### Statute of Limitations.

"Actions for debt where the indebtedness is not evidenced by a contract in writing" in Texas must be commenced within two years after accrual of the debt. Article 5526, Vernon's Civil Statutes of Texas. Where the indebtedness is evidenced by or founded upon a contract in writing the period of limitations is four years. Article 5527, id. The district court held the two-year statute applicable upon the theory that, "The contract did no more than furnish the occasion for the overpayment and the resulting Counterclaim," and Gulf Oil's "Counterclaim is nothing more than an action for money had and received."

■ In our view, the counterclaim was not necessary, and the overpayments were a good defense *pro tanto* to Lone Star's action for the purchase price of the crude oil delivered during the month of December 1960. During the entire 32 months, Lone Star delivered crude oil to Gulf Oil under a single written contract, dated April 1, 1958, calling for the sale of Lone Star's entire "owned and controlled production from Opelika and LaRue Fields." When we consider the unitary nature of the contract, it becomes clear that Lone Star's action was really for the balance due under that contract, the overpayments were defensive in nature, and the statute of limitations simply does not apply. Mason v. Peterson, Tex.Com.App. 1923, 250 S.W. 142, 147; DeWitt v. Kent County, Tex.Civ.App. 1940, 148 S.W.2d 213, 217.

If the counterclaim were necessary, we would have no difficulty in holding that the claim for the overpayments was evidenced by and founded upon the written contract, and, hence, not within the bar of the two-year statute of limitations. As is demonstrated by the discussion, *ante*, under the caption "The Contract Price," that price was definitely fixed *pursuant to the written contract* at $3.05 per barrel. A claim for overpayment would be as clearly evidenced by or founded upon the written contract as would a claim for underpayment.

"It has been held in this State that 'in order for an action to be one for an indebtedness evidenced by or founded upon a contract in writing, as referred to in the above quoted statute * * * the written instrument relied upon must itself contain a contract to do the things for the nonperformance of which the action is brought.' Shaw v. Bush, Tex. Civ.App., 61 S.W.2d 526, 528, writ refused * * *. However, it is not indispensable that the written instrument relied upon contain an express promise to do the things for the nonperformance of which the action is brought. It is sufficient if the obligation or liability grows out of a written instrument, not remotely but immediately, or if the written instrument acknowledge a state of facts from which, by fair implication, the obligation or liability arises."

International Printing Pressmen and Ass'ts Un. v. Smith, 1946, 145 Tex. 399, 198 S.W.2d 729, 736. See also Lander v. Boykin, Tex.Civ.App.1961, 351 S.W.2d 594, 596, 597.

### Adjustments.

■ Gulf Oil has, from the beginning, candidly admitted that the overpayments were caused by "our improper accounting." It was not shown that Lone Star had knowledge of any "transportation cost" which Gulf Oil should have deducted. Lone Star paid its royalty owners and its State production taxes in amounts based on Lone Star's receiving the applicable posted price for the oil without deduction for "transportation cost." That was more than Lone Star would have paid if Gulf Oil had not made the overpayments. How much, if any, of that excess can be recovered by Lone Star and at what expense, and how much represents an actual loss is not presently disclosed. Lone Star is liable to Gulf Oil for the overpayments only to the extent that Lone Star has benefited from them. See

A.L.I. Restatement Restitution, §§ 156–159. That amount, we apprehend, can be either stipulated or readily ascertained upon remand. The district court should also determine whether, under the Texas statute, Article 2226 of Vernon's Civil Statutes of Texas, Gulf Oil is entitled to recover its reasonable attorneys' fees, and, if so, the amount thereof.

The judgment is therefore reversed and the cause remanded.

Reversed and remanded.