**KERN OIL AND REFINING CO.,**
**Plaintiff/Counter-Defendant-Appellee,**

v.

**TENNECO OIL CO.,**
**Defendant/Counterclaimant-Appellant.**

**Nos. 84–6268, 84–6367 and 84–6482.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 6, 1985.

Decided June 24, 1986.

Richard E. Sherwood, O'Melveny & Myers, Los Angeles, Cal., for plaintiff/counter-defendant-appellee.

James R. Martin, Los Angeles, Cal., for defendant/counterclaimant-appellant.

---

Before ANDERSON, BEEZER and BRUNETTI, Circuit Judges.

BEEZER, Circuit Judge:

Kern Oil & Refining Co. filed an action against Tenneco Oil Company, seeking restitution for payments made to Tenneco under an alleged mistake of fact. Tenneco filed various counterclaims, including a claim for lost profits arising out of Kern Oil's failure to supply crude oil to Tenneco. In No. 84–6268, Tenneco challenges the district court's judgment in favor of Kern Oil on the restitution claim. In No. 84–6482, Tenneco seeks reversal of the district court's order granting attorneys' fees to Kern Oil. In No. 84–6367, Tenneco challenges the dismissal of the lost profits counterclaim for lack of prosecution. We affirm.

## I

### Background

Kern Oil is a general partnership doing business in California.[1] Tenneco is a Delaware corporation with its principal place of business in Texas. On May 19, 1977, Tenneco entered into a contract to sell crude oil to Kern Oil. Tenneco agreed to sell its production from twenty-four specified leases to Kern Oil. The contract contained the following terms:

> Crude oil from the above leases will be balanced against crude oil sold to Tenneco by [Kern Oil] up to 3,000 barrels per day. All stripper crude oil from the above leases and the Rosecrans Field ... will be sold at the appropriate lower tier price. Each month, enough oil from the Yowlumne Field will be sold at the lower tier price to make the total stripper and Yowlumne crude oil sold at the lower tier price equal to 3,000 barrels per day. *The remaining barrels produced from the Yowlumne Field will be sold at the upper tier price, and the non-stripper leases will be sold at the appropriate lower or upper tier prices.*

---

1. Kern Oil is successor in interest to Kern County Refinery, Inc., which was dissolved in 1982.

(emphasis added). The primary issue in this case is the interpretation of those terms.

In the mid-1970s, the Federal Energy Administration adopted a complex system to regulate the price of domestic crude oil. The FEA divided crude oil into three classes: "old," "new," and "stripper well." 10 C.F.R. §§ 212.54, 212.72 (1977). "Old" crude oil of a particular grade could not be sold for a price higher than the "lower tier ceiling price" for that grade. *Id.* § 212.-73(a). "New" crude oil of a particular grade could not be sold for a price higher than the "upper tier ceiling price" for that grade. *Id.* § 212.74(a). "Stripper well" crude oil could be sold at any price. *Id.* § 212.54(a)–(b).

By 1980, this system had become more complicated. As a part of the Carter Administration's effort to deregulate crude oil, the Department of Energy created several new classes of crude oil that could be sold at market price. One such class was "market level new" crude oil. The regulation stated:

> "Market level new crude oil" means, with respect to a particular property during a particular month, the product of the market level factor for that month and the volume of new crude oil produced and sold from that property during that month. The market level factor for January 1980 shall be four and sixtenths percent (4.6%) and shall be increased by four and six-tenths percent (4.6%) in each succeeding month.

10 C.F.R. § 212.72 (1980). "Market level new" crude oil is also referred to as "upper-tier released" crude oil. Under this system, all "new" crude oil would be deregulated in twenty-two months. The DOE also created two new classes of deregulated crude oil: "newly discovered" crude oil, *id.* § 212.79, and "tertiary incentive" crude oil, *id.* § 212.78(a)(2).

After Kern Oil and Tenneco entered into the contract, Tenneco consistently charged Kern Oil the posted upper tier price for "new" crude oil. At times, the posted upper tier price was less than the upper tier ceiling price. Accordingly, much of the crude oil was sold at prices below the ceiling price.

Beginning with the invoices for oil delivered in January 1980, Tenneco charged Kern Oil uncontrolled prices for a portion of the oil delivered pursuant to the contract. Tenneco's invoices described this crude oil as "newly discovered" or "upper-tier released." Kern Oil's accounting staff was not aware of the price limitation in the contract and thus paid the invoices without question. Kern Oil's management did not learn of the discrepancy until December 1980.

On December 30, 1980, Kern Oil notified Tenneco of the alleged overpayments and informed Tenneco that Kern Oil would withhold payment on outstanding Tenneco invoices to offset the overpayments. On February 13, 1981, Kern's attorneys sent a letter to Tenneco demanding reimbursement for the alleged overpayments. Kern Oil subsequently filed the present action to obtain restitution of the alleged overpayments.[2] Tenneco's answer contained six counterclaims, two of which were settled before trial.

### A. Nos. 84–6268 and 84–6482

The case was initially set before Judge Marshall. On March 20, 1984, Judge Marshall transferred the case to Judge Real for trial. The case was tried in June 1984. On July 31, 1984, Judge Real entered judgment for Kern Oil. Kern Oil received damages in the sum of $1,901,430.72, plus interest, costs, and attorneys' fees. On October 4, 1984, the attorneys' fee award was fixed at $516,863.13.

---

**2.** Kern Oil characterizes this action as a suit for breach of contract. It is apparent, however, that Tenneco never actually breached the contract. As a result, this action is properly charac-

terized as a suit for restitution of overpayments. *See* 3 G. Palmer, *The Law of Restitution* § 14.8 (1978); Levmore, *Explaining Restitution,* 71 Va. L.Rev. 65, 92–95 (1985).

**B.** *No. 84-6367*

Tenneco's fourth counterclaim ("Count IV") sought damages for lost profits. On February 16, 1984, Judge Marshall granted Kern Oil's motion for a partial summary judgment and dismissed Count IV. On March 16, 1984, Tenneco filed a motion for reconsideration. After the rest of the case had been transferred to Judge Real, Tenneco filed a motion for voluntary dismissal without prejudice. Tenneco sought the voluntary dismissal so that it could pursue its claim in a related action before Judge Waters. While Judge Marshall considered these motions, the rest of the case was tried before Judge Real.

On June 14, 1984, Judge Marshall granted the motion for reconsideration and vacated the summary judgment. The parties did not become aware of that decision until late June. On August 3, Judge Marshall denied the motion for voluntary dismissal. Judge Real set a trial date of August 20. On August 13, Tenneco renewed its motion for voluntary dismissal without prejudice. On August 20, Judge Real denied the motion and stated that the trial would commence on August 22. Tenneco then unsuccessfully sought an emergency stay from this court.

On the morning of August 22, the parties appeared before Judge Real. After again denying Tenneco's request for a voluntary dismissal without prejudice, Judge Real requested Tenneco's attorney to proceed with his opening statement. When the attorney refused to proceed, Judge Real dismissed Count IV with prejudice under Fed.R.Civ.P. 41(b).

## II

*The Interpretation of the Contract*

**A.** *Standard of Review*

■ We have stated the appropriate standard of review for the interpretation of a contract as follows:

> When an appellate court restricts its review of the trial court's interpretation of a contract to an analysis of the language used in the contract, the issue of

interpretation is a matter of law and freely reviewable.... When the interpretation includes a review of factual circumstances surrounding the contract, the principles of contract interpretation applied to those facts present issues of law which this court can freely review. When the inquiry extends beyond the words of the contract and focuses on related facts, however, the trial court's consideration of extrinsic evidence is entitled to great deference and its interpretation of the contract will not be reversed unless it is clearly erroneous.

*In re U.S. Financial Securities Litigation,* 729 F.2d 628, 631–32 (9th Cir.1984) (citations omitted). We review the district court's decisions regarding the admissibility of evidence for an abuse of discretion. *Mitchell v. Keith,* 752 F.2d 385, 392 (9th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985).

**B.** *The Meaning of "Upper Tier Price"*

Contrary to Tenneco's assertions, the record reveals that the meaning of the term "upper tier price" was virtually undisputed. The "upper tier price" was the price charged for crude oil that was subject to the upper tier ceiling price. The upper tier price was less than or equal to the upper tier ceiling price, depending on market conditions. Crude oil that was not subject to the upper tier ceiling price was sold at the "lower tier price" or the "uncontrolled price," depending on the type of oil. "New" crude oil that was not subject to the upper tier ceiling price was sold at the "uncontrolled price." Crude oil from a particular field would normally have two or three different prices because the oil would be subject to different regulations.

The district court made the following finding of fact:

> The term "upper-tier price," as used in the May 19, 1977 agreement, is unambiguous. Upper-tier ceiling prices are specific ceiling prices established by DOE regulations and computed by a formula set forth in those regulations. 10 C.F.R. § 212.74(b) (1977 and 1980). Posted up-

per-tier prices are prices at or below upper-tier ceiling prices, published in price bulletins issued by major oil companies. The term "upper-tier price" does not mean uncontrolled market prices posted for crude oil released by the government from price controls.

The district court's finding was correct.[3]

### C. *Extrinsic Evidence*

■ The district court found that the contract was intended to be "a final and complete expression" of the parties' agreement. As a result, section 2–202 of the Uniform Commercial Code governs the interpretation of the agreement:

> Terms ... which are ... set forth in writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> (a) by course of dealing or usage of trade (Section 1–205) or by course of performance (Section 2–208); and
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Tex.Bus. & Com.Code Ann. § 2.202. Tenneco does not contend that the record reflects the existence of "consistent additional terms" within the meaning of section 2–202(b). Instead, Tenneco argues that the record reveals the existence of a course of dealing and a course of performance contrary to the district court's findings. Section 2–208(2) states:

> The express terms of the agreement and any ... course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade....

Tex.Bus. & Com.Code Ann. § 2.208(b). Section 2–208(2) is liberally applied to allow the admission of extrinsic evidence that is reasonably consistent with the express terms of the contract. *Modine Manufacturing Co. v. North East Independent School District*, 503 S.W.2d 833, 840 (Tex. Civ.App.1973); *see Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772, 794–805 (9th Cir.1981) (applying Hawaii law); Hawkland, *Sales Contract Terms Under the UCC*, 17 UCC L.J. 195, 208–17 (1985).[4]

---

**3.** Tenneco challenges the district court's finding on two grounds. First, Tenneco argues that the district court incorrectly assumed that the "upper tier price" was defined in the regulations. This argument misstates the district court's findings. The district court did not find that "upper tier price" meant "upper tier ceiling price." Instead, the district court correctly found that the "upper tier price" was the price at which crude oil subject to the "upper tier ceiling price" was sold.

Second, Tenneco argues that "in 1980, there existed two prices for oil still defined as upper tier—a lower restricted price for oil still subject to controls and a higher unrestricted price for oil released from controls." This argument is incorrect. "New" crude oil and "upper tier crude oil" are not synonymous. It is true that two prices existed for "new" crude oil: the "upper tier price" and the "uncontrolled price." For any particular field, however, only one "upper tier price" existed.

**4.** Tenneco makes the following assertion: "No extrinsic evidence was considered. The district court excluded all such evidence—including evidence of course of dealing, usage of trade, and course of performance—because it found the term 'upper tier price' unambiguous." While Tenneco's relies heavily on that premise, in fact it is false. Initially, it is apparent that the district court relied on trade usage evidence in determining the meaning of "upper tier price." Moreover, the record reveals that the district court admitted a substantial amount of extrinsic evidence. Conclusion of Law No. 5 states, in pertinent part:

> As the May 19, 1977 agreement was intended by the parties to be a final and complete expression of the agreement, and as the parties' intent as to price is clear from the four corners of the contract, *as well as from the testimony of those who negotiated and drafted the agreement,* extrinsic evidence is not admissible to contradict its express price terms.

To avoid the prohibition contained in section 2–208(2), Tenneco must show that the extrinsic evidence "explains" or "supplements" the express terms of the contract. The extrinsic evidence cited by Tenneco does not show that "upper tier price" has a meaning different from the meaning found by the district court. As a result, the extrinsic evidence does not "explain" that term. The remaining inquiry is whether the extrinsic evidence "supplements" the contract. To be admissible under that theory, the extrinsic evidence must tend to show that the parties intended for Tenneco to charge the highest available market price without the need to negotiate with Kern Oil in the event of deregulation. *See Columbia Nitrogen Corp. v. Royster Co.,* 451 F.2d 3, 7–10 (4th Cir.1971) (requiring the admission of evidence showing that, in the fertilizer industry, quantity terms in contracts are "mere projections") (applying Virginia law); Duesenberg, *Sales, Bulk Transfers, and Documents of Title,* 38 Bus.Law. 1109, 1112–14 (1983). A careful review of the record reveals that Tenneco's extrinsic evidence did not meet that requirement.

■ Initially, Tenneco argues that the district court improperly excluded evidence relating to the prior course of dealings between Tenneco and Kern Oil. In fact, the evidence that was excluded related to the negotiation of a single prior contract. "[A] single transaction cannot contitute a course of dealing." *International Therapeutics, Inc. v. McGraw-Edison Co.,* 721 F.2d 488, 491 (5th Cir.1983) (applying Texas law); *see* U.C.C. § 2–208 comment 4 (not-

ing that a "single occasion of conduct" does not establish a course of performance). Moreover, Tenneco's witnesses indicated that the 1977 contract fully reflected the parties' agreement.[5] Accordingly, the district court properly excluded the evidence relating to the prior transaction.

Tenneco also asserts that the record shows four occasions on which Tenneco sold crude oil to Kern Oil at prices higher than those authorized by the contract. Tenneco claims that this evidence establishes a course of performance. In fact, the record reveals that each price variation was negotiated.[6] Accordingly, the four occasions cited by Tenneco do not establish a course of performance contrary to the district court's findings. *See Jon-T Chemicals, Inc. v. Freeport Chemical Co.,* 704 F.2d 1412, 1416 n. 5 (5th Cir.1983) (applying Texas law).

■ Finally, Tenneco argues that Kern Oil's payment of the invoices in 1980 establishes a course of performance. To the extent that Kern Oil acted under a mistake of fact, however, its payment of the invoices cannot constitute a course of performance. The mistake of fact issue is discussed below.[7]

## III

### *Kern Oil's Mistake*

A. *Standard of Review*

■ The district court's findings of fact are reviewed under the clearly erroneous standard. Fed.R.Civ.P. 52(a); *see Anderson v. City of Bessemer City,* 470 U.S.

(emphasis added). The district court evidently concluded that the bulk of the extrinsic evidence introduced by Tenneco contradicted the express terms of the contract. Under section 2–208(2), such evidence is inadmissible.

5. During oral argument before us, counsel for Tenneco conceded that the parties did not contemplate the effect of deregulation during the negotiation of the contract in 1977.

6. Tenneco argues that the price variations were not actually negotiated. At the very least, however, Kern Oil's management was formally notified of the price change. By acquiescing in the

price variations, Kern Oil's management effectively authorized a modification of the contract. *See* Tex.Bus. & Com.Code Ann. §§ 2.201(c)(3), 2.209(a).

7. In 1980, Tenneco charged Kern Oil the uncontrolled price for shipments of "heavy" crude oil. Tenneco attempted to introduce that fact into evidence, arguing that Kern Oil's failure to object to the charge for heavy crude oil established a course of performance. The district court properly excluded the evidence as irrelevant. The fact that Kern Oil decided not to seek restitution of a particular overpayment does not establish a course of performance.

564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *Allen v. Steele,* 759 F.2d 1469, 1470 (9th Cir.1985). Tenneco asserts that the district court adopted Kern Oil's proposed findings of fact "virtually verbatim." In such a case, the clearly erroneous standard applies, although "close scrutiny" of the record is appropriate. *United States v. Washington,* 641 F.2d 1368, 1371 (9th Cir. 1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982).

### B. *The Existence of a Mistake*

The district court entered lengthy findings of fact regarding the existence of a mistake. The district court found that Kern Oil's senior management did not become aware of Tenneco's pricing decision until December 1980 and that Kern Oil's accounting department had paid the invoices mechanically, relying on Tenneco's assertion that the crude oil was "newly discovered" or "upper tier released." The district court's findings are thoroughly supported by the record.

Tenneco argues at great length that the district court's findings are wrong. It is apparent that the record contains a great deal of evidence that could be interpreted in more than one way. Nevertheless, the district court's conclusion that the record supported Kern Oil's position was not clearly erroneous.

### C. *Mistake of Fact vs. Mistake of Law*

■ Under Texas law, it is well settled that, "even though [a party to a contract] was under no legal obligation to make the overpayments, if the money was voluntarily paid, with full knowledge of all the facts, it cannot be recovered." *Gulf Oil Corp. v. Lone Star Producing Co.,* 322 F.2d 28, 31 (5th Cir.1963) (applying Texas law); *see Pennell v. United Insurance Co.,* 150 Tex. 541, 243 S.W.2d 572, 576 (1951); 3 G. Palmer, *supra,* § 14.27. The district court found that Kern Oil made a mistake of fact, rather than a mistake of law. Finding of Fact No. 27 states, in pertinent part:

Kern's payment of the uncontrolled market price invoices for January through October 1980 deliveries was a mistake. It was not made voluntarily or with the intention to waive Kern's contractual rights. Kern did not knowingly acquiesce in Tenneco's charging prices above the contract price.

The district court found that Kern Oil's accounting staff was not aware that the uncontrolled price was improper and that Kern Oil's senior management was not aware that Tenneco was charging the uncontrolled price until December, 1980. Accordingly, no single person at Kern Oil had the requisite knowledge to render the payment a mistake of law. As noted above, these findings were not clearly erroneous.

The district court's findings raise a single issue of law: whether Kern Oil can assert that the payments were made under a mistake of fact when its employees collectively knew all of the relevant facts. Tenneco argues that the knowledge of different employees of a business entity must be imputed to the entity. Under Texas law, Tenneco is incorrect. Before a mistake of law will be found, "the overpayments must have been truly voluntary, that is, 'done by design or intentionally or purposely or by choice or of one's own accord or by the free exercise of the will.' There must appear 'an intention on the part of the payor to waive his rights.'" *Gulf Oil,* 322 F.2d at 31 (citations omitted). Under the district court's findings of fact, it cannot be said that Kern Oil intended to waive its rights. Accordingly, the district court properly concluded that Kern Oil committed a mistake of fact. *See id.* at 32–33 (finding a mistake of fact when a corporation's accounting department paid an invoice with excessive charges); 3 G. Palmer, *supra,* § 14.8, at 175 ("Carelessness of the payor is not a sufficient reason for denying recovery of the unjust gain.").

Tenneco cites several cases in support of its position. Most of those cases stand for the well established rule that notice to an agent constitutes notice to the principal. *Central Airlines, Inc. v. Kahle,* 419

S.W.2d 873, 876 (Tex.Civ.App.1967) (service of process); *Pyramid Drilling Co. v. Howell,* 173 S.W.2d 250, 252 (Tex.Civ.App.1943) (formation of corporation); *United States Fidelity & Guaranty Co. v. San Diego State Bank,* 155 S.W.2d 411 (Tex.Civ.App. 1941) (administration of guardianship). If Tenneco had notified Kern Oil's accounting department that it was changing the price of the crude oil, those cases would control. Instead, Tenneco unilaterally altered the price without notice.

Tenneco also cites *United States v. T.I. M.E.—D.C., Inc.,* 381 F.Supp. 730, 738–39 (W.D.Va.1974), in which the court held that a corporation could be held criminally responsible for the collective knowledge of its employees. The corporation had a duty to insure that its drivers obeyed a federal regulation. Various employees had notice of facts that, taken together, revealed that the drivers were violating the regulation. The holding that the corporation was charged with knowledge of the violations was thus based on the corporation's legal duty to prevent the violations. Such a duty is not present in this case.

Tenneco relies heavily on *Preston Farm & Ranch Supply, Inc. v. Bio-Zyme Enterprises,* 625 S.W.2d 295 (Tex.1981). The issue in *Preston Farm* was whether a buyer had agreed to pay a service charge for late payments on certain debts. The buyer admitted at trial that he agreed initially to the service charges to his account until he found out that too much interest was being charged. *Id.* at 298. Moreover, the bookkeeper was authorized by the buyer to make any payments required by the seller's invoices, which included the service charge provision. The invoices sent by the seller to the buyer's bookkeeper included a col-

umn conspicuously stamped "service charge." The court held that the bookkeeper's knowledge of the service charge was imputed to the buyer. *Id.* at 300.

*Preston Farm* is distinguishable from the present case. In contrast with *Preston Farm,* Kern Oil's management never expressly agreed to any change in the contract price. Furthermore, because Tenneco's invoices stated that the charges were "per contract of May 19, 1977," Kern Oil's accounting department did not even know that Tenneco was changing the price. There was no knowledge of any change in price to be imputed to Kern Oil's senior management. Unlike the bookkeeper in *Preston Farm,* Kern Oil's accounting department paid the invoices under a mistake of fact.

### D. *Estoppel*

■ Tenneco argues that Kern Oil is estopped from seeking restitution because Tenneco relied on Kern's payments. Specifically, Tenneco asserts that it would have cancelled the Kern Oil contract if it had known that it could charge only the upper tier price. Detrimental reliance is an affirmative defense. *See Tomlinson v. Lackey,* 555 S.W.2d 810, 813 (Tex.Civ.App. 1977); Fed.R.Civ.P. 8(c). Accordingly, the burden of proof was on Tenneco. *See Jones v. Taber,* 648 F.2d 1201, 1203 (9th Cir.1981); *Insurance Co. of North America v. McCleave,* 462 F.2d 587, 588 (3d Cir.1972). Tenneco failed to produce evidence showing that it would have cancelled the contract if it knew that the price was limited to the upper tier price. The district court's finding that Tenneco failed to establish detrimental reliance was not clearly erroneous.[8]

---

8. Tenneco argues, however, that the district court erred by excluding evidence that would have shown detrimental reliance. Initially, Tenneco notes that the district court excluded testimony regarding the ultimate decision to terminate the contract in late August 1980. The record contains no indication that the witness would have testified that Tenneco would have cancelled the contract earlier if it had known that the price was limited. Tenneco also notes that the district court excluded testimony show-

ing that a particular witness would have been willing to pay the uncontrolled price for Tenneco's crude oil. Tenneco asserts that this shows the existence of willing buyers. In fact, the excluded testimony was cumulative. The record contains substantial evidence regarding the market price for various types of crude oil. A market price is the price that willing buyers will pay and that willing sellers will accept. As a result, the market price data in the record shows the existence of willing buyers. In any

## IV

### Dependent Covenants

■ Under the contract, Kern Oil and Tenneco were obligated to sell each other 3,000 barrels of crude oil per day at the lower tier price. The purpose of this provision was to save transportation costs: Kern Oil purchased California oil from Tenneco and Tenneco purchased West Texas Oil from Kern Oil. Sales of crude oil by Tenneco in excess of 3,000 barrels per day were at the upper tier price. Kern Oil was unable to sell Tenneco 3,000 barrels per day on a consistent basis. Tenneco asserts that Kern thus breached the contract. Tenneco argues that the covenants in the contract were dependent, so that Kern Oil's breach bars recovery from Tenneco. The record reveals, however, that Tenneco waived any breach by Kern Oil. While Tenneco could have cancelled the contract, it instead continued shipping oil to Kern Oil "per contract dated May 19, 1977." Accordingly, Tenneco cannot assert Kern's nonperformance in defense of its own breach. *See Mandril v. Kasishke*, 620 S.W.2d 238, 245 (Tex.Civ.App.1981); *cf.* Tex.Bus. & Com.Code Ann. § 2.612(c) (stating that a breached installment contract is reinstated "if [the aggrieved party] accepts a nonconforming installment without seasonably notifying of cancellation or if he brings an action with respect only to past installments or demands performance as to future installments").

## V

### Attorneys' Fees

#### A. Availability

■ In a diversity case, the availability of attorneys' fees is governed by state law. *Diamond v. John Martin Co.*, 753 F.2d 1465, 1467 (9th Cir.1985). The relevant Texas statute states:

Any person, corporation, partnership, or other legal entity having a valid claim against a person or corporation ...

event, the existence of willing buyers does not prove that Tenneco would have cancelled the

founded on oral or written contracts, may present the same to such persons or corporation or to any duly authorized agent thereof; and if, at the expiration of 30 days thereafter, payment for the just amount owing has not been tendered, the claimant may, if represented by an attorney, also recover, in addition to his claim and costs, a reasonable amount as attorney's fees.... This Act shall be liberally construed to promote its underlying purposes.

Tex.Rev.Civ.Stat.Ann. art. 2226.

Tenneco argues that attorneys' fees were not available because Kern Oil failed to plead entitlement to attorneys' fees. Tenneco is incorrect. The pretrial order listed the availability of attorneys' fees as a contested issue of law and stated that it superseded the pleadings. *See* Fed.R.Civ.P. 16(e) ("This [pretrial] order shall control the subsequent course of the action unless modified by a subsequent order."). Without objection by Tenneco, Kern Oil introduced evidence showing that the claim had been presented to Tenneco in accordance with Article 2226. Accordingly, the attorneys' fee issue was properly raised.

#### B. Calculations

Tenneco argues that the district court's findings were inadequate under the standards of this court for the setting of attorneys' fee awards. *See Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984); *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975), *cert. denied*, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976). Tenneco is incorrect. Article 2226 states:

The usual and customary fees ... shall be presumed to be reasonable, but such presumption may be rebutted by competent evidence. In a proceeding before the court, ... the court may in its discretion take judicial notice of the usual and customary fees in such matters and of

contract.

the contents of the case file without receiving further evidence.

Accordingly, the standards set forth in *Kerr* do not apply under Texas law. The extensive documentation submitted by Kern Oil supports Judge Real's determination. Accordingly, the record does not reveal an abuse of discretion.

## VI

### *Dismissal of Count IV*

■ Tenneco sought a dismissal of Count IV under Federal Rule of Civil Procedure 41(a)(2), which states: "[After the filing of an answer], an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper.... Unless otherwise specified in the order, a dismissal under this paragraph is without prejudice." The district court denied Tenneco's motion. When Tenneco refused to go forward, the district court dismissed the action under Rule 41(b), which states:

> For failure of the plaintiff to prosecute ..., a defendant may move for dismissal of an action or of any claim against him.... If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a). Unless the court in its order otherwise specifies, a dismissal under this subdivision ... operates as an adjudication on the merits.

The district court entered findings of fact and conclusions of law in support of the dismissal. *See Industrial Building Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336, 1339 (9th Cir.1970). Tenneco argues that the district court erred by refusing to dismiss without prejudice under Rule 41(a)(2).

### A. *Standard of Review*

"The Ninth Circuit has long held that the decision to grant a voluntary dismissal under Rule 41(a)(2) is addressed to the sound discretion of the District Court, and its order will not be reversed unless the District Court has ˙abused its discretion."

*Hamilton v. Firestone Tire & Rubber Co.,* 679 F.2d 143, 145 (9th Cir.1982); *see Purer & Co. v. Aktiebolaget Addo,* 410 F.2d 871, 879 (9th Cir.), *cert. denied,* 396 U.S. 834, 90 S.Ct. 90, 24 L.Ed.2d 84 (1969). When the plaintiff takes a dismissal with prejudice under Rule 41(b) to challenge the denial of a dismissal without prejudice under Rule 41(a)(2), the plaintiff proceeds "at its peril." *Blue Mountain Construction Co. v. Werner,* 270 F.2d 305, 307 (9th Cir.1959), *cert. denied,* 361 U.S. 931, 80 S.Ct. 371, 4 L.Ed.2d 354 (1960).

### B. *Forum Shopping*

The district court found that "Tenneco's repeated requests to be allowed to dismiss Count IV without prejudice were made for the purpose of avoiding Judge Marshall and this Court and having the same claim heard by Judge Waters; thus, they constitute impermissible forum shopping." Tenneco argues that the district court was wrong. Count IV involves the failure of Kern Oil to supply crude oil to Tenneco. The cases pending before Judge Waters involve other issues related to the supply of crude oil under the May 19, 1977 contract. Tenneco asserts that its sole motivation in seeking a voluntary dismissal was to consolidate all of the "supply" cases. The flaw in Tenneco's argument is that Count IV was a compulsory counterclaim in the "price" case before Judges Marshall and Real. *See* Fed.R.Civ.P. 13(a). If Judge Marshall had dismissed Count IV without prejudice, the final judgment entered by Judge Real would have barred the litigation of the issues raised in Count IV. *See Baker v. Gold Seal Liquors, Inc.,* 417 U.S. 467, 469 n. 1, 94 S.Ct. 2504, 2506 n. 1, 41 L.Ed.2d 243 (1974); *Sams v. Beech Aircraft Corp.,* 625 F.2d 273, 276 n. 4 (9th Cir.1980). Accordingly, Tenneco's justification for seeking a voluntary dismissal was baseless.

The circumstances of this case support the district court's finding that Tenneco was forum shopping. Tenneco states that Judge Waters had come close to granting summary judgment for Tenneco in a relat-

ed action. Judge Marshall, on the other hand, granted summary judgment for Kern Oil on Count IV. Tenneco did not request a voluntary dismissal until *after* the granting of summary judgment. When Judge Marshall informed the parties that the case would be transferred to another judge for trial, Tenneco unsuccessfully sought permission to delay filing a motion for reconsideration of the summary judgment until the new judge was named. After Judge Real entered judgment for Kern Oil in the price case, Tenneco refused to try Count IV before Judge Real. Tenneco's filings emphasize Tenneco's desire to litigate Count IV before Judge Waters. In light of these circumstances, the district court was justified in finding that Tenneco was forum shopping.

Tenneco also asserts that Judge Real scheduled the trial of Count IV so quickly that Tenneco could not have been prepared. It is true that Judge Real denied Tenneco's request for a continuance. We note, however, that Tenneco has not appealed that ruling. While lack of time to prepare could justify a continuance, it does not justify a voluntary dismissal.

### C. *Jurisdiction*

Conclusion of Law No. 2 states:

This Court does not have jurisdiction to overrule Judge Marshall's Order denying Tenneco's motion for "non-suit," *i.e.,* voluntary dismissal without prejudice, of Count IV. Tenneco's *ex parte* application to this Court for voluntary dismissal without prejudice of Count IV constitutes an impermissible "horizontal appeal" of Judge Marshall's decision.

The district court was incorrect. While it is true that district courts do not normally overrule each other after a case is transferred, that rule is prudential, rather than jurisdictional. *See, e.g., Wilson v. Ohio River Co.,* 236 F.Supp. 96, 98 (S.D.W.Va. 1964), *aff'd,* 375 F.2d 775 (4th Cir.1967). As a result, Judge Real had jurisdiction to review Judge Marshall's order. Nevertheless, Judge Marshall's ruling was entitled to deference.

### D. *Prejudice to Kern Oil*

The district court considered the prejudice to Kern Oil in Finding of Fact No. 25:

Kern would be prejudiced by a voluntary dismissal of Count IV without prejudice because of, *inter alia,* the extensive discovery taken in this case, the burden of duplicative discovery in the cases before Judge Waters, and its intensive preparation for trial on August 20, and the fact that Count IV arising out of the contracts before the court in the first trial make Count IV a compulsory counterclaim in this case.

The district court's findings are supported by the record, although the extent of the prejudice to Kern Oil is questionable. *Cf. Hamilton,* 679 F.2d at 145 (holding that the defendant had not established sufficient prejudice from the granting of a voluntary dismissal "merely by asserting that it had begun trial preparations").

### E. *Summary*

It is apparent from the record that the handling of the various actions between Tenneco and Kern Oil was less than ideal. It would have been appropriate to consolidate the various actions under Fed.R. Civ.P. 42(a). Nevertheless, Tenneco had little justification for refusing to try Count IV before Judge Real. In light of Judge Real's findings of fact, we conclude that the dismissal of Count IV did not constitute an abuse of discretion.

## VII

### *Conclusion*

The judgment of the district court is AFFIRMED.