United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 6, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 03-11053
_____


THE BANK OF SAIPAN; ET AL.,

                                                    Plaintiffs

THE BANK OF SAIPAN;
ANTONIO S. MUÑA, Receiver,

                                        Plaintiffs - Appellants,

                            versus

CNG FINANCIAL CORP.; ET AL.,

                                                    Defendants

CNG FINANCIAL CORP.,

                                        Defendant - Appellee.
_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 1:02-CV-117
_____

Before JOLLY, DAVIS, and JONES, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

     The Bank of Saipan (the "Bank") sued CNG Financial Corp.
("CNG") for damages resulting from a complex fraud perpetrated by
third parties against both entities.  The facts of this case
involve at least two fraudulent schemes involving con-artists who
are now tucked away in jail.  The facts more specifically relevant
involve the victims of these schemes:  the Bank, which loaned money
to the con-artist to purchase the subsidiaries of CNG; and CNG,

which received the loan proceeds as partial payment for the subsidiaries, which it had to reassume when the con-artist purchaser defaulted. The Bank argues it is entitled to the money it loaned the purchaser, which is proceeds in CNG's possession; but CNG argues that the Bank is not entitled to these proceeds because it has unclean hands, a defense to the Bank's equitable claim for money had and received.

At the close of the Bank's evidence, the district court granted judgment as a matter of law to CNG. We affirm the dismissal of the fraud claim. We reverse the dismissal of the money had and received claim, and remand it for trial.

I

In the summer of 2001 two sophisticated con-artists -- now serving time in federal prison on various fraud convictions -- arrived in Saipan, an American territory in the Western Pacific. These men, B. Douglas Montgomery and DuSean Berkich, pretended to be important and wealthy businessmen and wanted to buy the small Bank of Saipan. Montgomery and Berkich colluded with Bank president Tomas Aldan and offered to buy the Bank.

Even before the sale was finalized, Montgomery and Berkich took over the Bank and began making improper and undocumented loans to various individuals without the knowledge of the Bank's shareholders or Board of Directors. In the end, Montgomery and Berkich's scam was discovered before the sale was finalized but not before considerable sums of money had been looted.

Meanwhile, in Texas, Michael Wilson, another sophisticated con-man with a previous felony conviction, presented himself to CNG as an important and wealthy businessman, and expressed his intent to purchase two of CNG's failing subsidiaries, Finity and Fi-Scrip. Wilson, who apparently had no funds at all, needed capital to finance the purchase. A mutual con-artist friend arranged a meeting with Montgomery and Berkich to obtain a loan. After meeting in Saipan, Montgomery and Berkich loaned Wilson $5 million of the Bank's money, $4.5 million of which was paid to CNG in the purchase of Finity and Fi-Scrip.

Wilson had feigned wealth on a claim to 48,000 outstanding credit card accounts. The accounts, which were in fact nonexistent, were to be used as collateral for his Bank loan. Wilson actually informed Montgomery and Berkich that these accounts did not exist, but the two loaned him the $5 million anyway. CNG was, allegedly, also aware of Wilson's lies regarding the phony credit card accounts but decided to proceed with the deal provided Wilson could obtain the necessary financing. The Bank alleges that CNG knew or should have known that Wilson could not obtain financing legitimately. The Bank further states that CNG raised its asking price for its subsidiary companies substantially after it learned of Wilson's fraud, presumably to take advantage of the known fraud in whatever way it could.

Wilson paid the $4.5 million from the Bank to CNG and CNG financed the remaining amount to satisfy its $19.7 million asking

3

price in the form of promissory notes taken from Wilson. Wilson eventually defaulted on the promissory notes and the Bank loan, and CNG took back its interest in the subsidiary companies (but retained the $4.5 million pilfered from the bank).

This suit arose in federal district court when Fi-Scrip, Finity and others sued the Bank for release of the Bank's UCC-1 filing on some of Finity and Fi-Scrip's computer equipment. The Bank responded with counterclaims against CNG and others for the losses it suffered from the Wilson loan. At issue before the district court were the remaining claims by the Bank against CNG for misrepresentation, aiding and abetting fraud, unjust enrichment, money had and received, and joint enterprise.

At trial, after the conclusion of the Bank's evidence, CNG moved for an entry of judgment as a matter of law pursuant to FED. R. CIV. P. 50. The district court granted the motion and made the following oral findings: 1) there was no misrepresentation by CNG to the Bank; 2) CNG did not owe a special duty to the Bank that would require disclosing information about Wilson; 3) there was no joint venture between CNG and Wilson that would make CNG liable for Wilson's conduct; 4) there was no evidence that CNG committed fraud or duress, or took any undue advantage of the situation; 5) there was no evidence that CNG knew or should have known that Wilson was defrauding the Bank; 6) any representations that may have been made by CNG had no influence whatsoever on whether the Bank would lend the money to Wilson; 7) the Bank lacked clean hands; and 8) CNG

relied upon the Bank loan by changing its position and transferring interest in Fi-Scrip and Finity to Wilson.  The Bank filed a timely appeal of the district court's judgment as a matter of law with respect to the money had and received and fraud claims.

## II

We review judgments as a matter of law pursuant to Rule 50 <u>de novo</u>, applying the same standards that the district court applied and considering all the evidence in the light most favorable to the party opposing the motion.  <u>Resolution Trust Corp. v. Cramer</u>, 6 F.3d 1102, 1109 (5th Cir. 1993).  "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party."  FED. R. CIV. P. 50(a)(1).

## A

We first review the judgment as a matter of law with respect to the money had and received claim.  Texas follows the ordinary principles of common law for such claims:

> The question, in an action for money had and received, is to which party does the money, in equity, justice, and law, belong.  All plaintiff need show is that defendant holds money which in equity and good conscience belongs to him.  Again, it has been declared that a cause of action for money had and received is less restricted and fettered by technical rules and formalities than any other form of action.  It aims at the abstract justice of the case, and looks solely at the

5

> inquiry, whether the defendant holds money,
> which belongs to the plaintiff.

Staats v. Miller, 243 S.W.2d 686, 687-88 (Tex. 1951) (quoting 58 C.J.S., Money Received § 4a, and United States v. Jefferson Elec. Mfg. Co., 291 U.S. 386, 402-03 (1934) (internal quotations omitted)). Most recently, an intermediate Texas court explained that "[t]o maintain an action for money had and received, [a plaintiff must] establish that the [defendant] held money which in equity and good conscience belonged to [the plaintiff] . . . . Money had and received is an equitable doctrine applied to prevent unjust enrichment." Miller-Rogaska, Inc. v. Bank One, Texas, N.A., 931 S.W.2d 655, 662 (Tex. App. -- Dallas 1996).

The Bank argues, and offered evidence at trial to demonstrate, that CNG is holding money that rightfully belongs to the Bank and that, absent the fraud by Montgomery and Berkich, the Bank would still possess that money. As a matter of equity, therefore, the Bank contends that the money should be returned to it.

CNG does not dispute any of the Bank's basic contentions but instead argues that an action for money had and received, like all equity-oriented actions, carries with it the affirmative defense of "unclean hands." That is, a plaintiff seeking equitable relief, once the affirmative defense is raised, must show that she has not contributed to the harm at issue. See, e.g., Truly v. Austin, 744 S.W.2d 934, 938 (Tex. 1988). The doctrine is applied where a plaintiff's conduct "has been unconscientious, unjust, marked by a

want of good faith or violates the principles of equity and righteous dealing." City of Fredericksburg v. Bopp, 126 S.W.3d 218, 221 (Tex. App. -- San Antonio 2003) (citations omitted).[1]

Further, CNG argues that a finding of "unclean hands," or, as the district court stated, "lack of equity . . . on the bank's part in regard to this transaction," is a complete bar to recovery. When a plaintiff's own actions, rather than the defendant's equitable wrongs, are the source of the plaintiff's loss, there can be no unjust enrichment. See, e.g., Harris v. Sentry Title Co., Inc., 715 F.2d 941, 949-50 (5th Cir. 1983) (court refused to impose constructive trust on property third party failed to surrender).[2] Similarly, where monetary transactions are involved, the payor

---

[1]The Bank argues that the money had and received claim, as an action at law, is not subject to the "unclean hands" equitable doctrine. CNG contends that this argument was raised for the first time in the Bank's reply brief, and moves to strike the relevant portions of that brief. We need not rule on the motion, however, as the Bank's view of the law is not the law of Texas: "[R]ecovery for money had and received, though legal in nature, is controlled by equitable principles, and . . . it is axiomatic that the "clean hands" doctrine functions in equitable actions." Texas Bank & Trust Co. v. Custom Leasing, Inc., 498 S.W.2d 243, 251 (Tex. Civ. App. -- Tyler 1973) (citing 6 Tex. Jur. 2d, Assumpsit, §§ 2, 6, 9), rev'd on other grounds sub nom. Custom Leasing, Inc. v. Texas Bank & Trust Co., 516 S.W.2d 138 (Tex. 1974). See also Red Ball Motor Freight, Inc. v. Bailey, 332 S.W.2d 411 (Tex. Civ. App. -- Amarillo 1959); Aetna Casualty & Surety Co. v. Corpus Christi Nat. Bank, 186 S.W.2d 840 (Tex. Civ. App. -- San Antonio 1944)); cf. Clark v. Amoco Prod. Co., 794 F.2d 967, 971 (5th Cir. 1986) (equitable defense of laches applicable to actions at law involving claims of an essentially equitable character). Consequently, CNG's motion is DENIED as moot.

[2]The mandate in Harris was recalled, but "the original decision stands unchanged except [with respect to unrelated issues]." 727 F.2d 1368, 1371 (5th Cir. 1984).

7

cannot recover his money when "the payment was made intentionally and in circumstances showing a determination to pay without choosing to investigate the facts." Gulf Oil Corp. v. Lone Star Prod. Co., 322 F.2d 28, 32 (5th Cir. 1963) (quoting 44 Tex. Jur. 2d Payment § 77). CNG thus argues it is under no obligation to return the Bank's money because the Bank was complicit in its own loss.

Yet the cases applying the clean hands doctrine, particularly as a defense to a claim for money had and received, are equivocal as to whether unclean hands (or what relative degree of unclean hands) bar recovery altogether. Texas courts have long spoken in terms of weighing the equities, even when foreclosing recovery completely; the inquiry must thus go beyond an analysis of the plaintiff's errors of omission or commission, to balance these against the defendant's unjust acts. See, e.g., Norris v. Gafas, 562 S.W.2d 894, 897 (Tex. Civ. App. -- Houston 1978) (clean hands doctrine "does not operate to repel all sinners from a court of equity"); Ligon v. E. F. Hutton & Co., 428 S.W.2d 434, 437 (Tex. Civ. App. 1968) (mere negligence does not render hands so unclean as to bar recovery); Red Ball, 332 S.W.2d at 418-19 (repeated appeals to "equity and good conscience" in considering unclean hands defense); Aetna, 186 S.W.2d at 842 (bank may recover fraudulently obtained funds even if it is negligent, provided recovery does not pass loss to innocent payee); Edwards v. Trinity & B.V. Ry. Co., 118 S.W. 572, 576 (Tex. Civ. App. 1909) (negligence must amount to violation of positive legal duty for it to wholly

bar relief -- and then only if the other party has been prejudiced). Thus the unclean hands defense seems to operate akin to the way a comparative (as opposed to contributory) negligence regime does for ordinary tort claims.[3]

The evidence cited by CNG against the Bank to support its affirmative defense of unclean hands sounds in negligence. CNG argues that the Bank failed to investigate Wilson's credit and collateral, and that the Bank's board, loan committee, and other officers failed in their corporate responsibilities. None of CNG's allegations suggest that the Bank (as opposed to the con-artists) acted in bad faith or engaged in illegal activity; in sum, CNG contends that the Bank is guilty of gross negligence at most.[4] Therefore, on the basis of the record before us, and in the light of the Texas case law cited supra, we cannot say as a matter of law that unclean hands completely bars recovery in this case. There

---

[3]This is consistent with our case law. See, e.g., Gulf Oil, 322 F.2d at 31-32. The only clear precedent to the contrary, Texas Bank & Trust, 498 S.W.2d at 251 (lack of "ordinary care" normally precludes recovery), was vacated by the Texas Supreme Court, which in reversing on other grounds, explicitly *did not reach* the question of whether the plaintiff's alleged negligence completely relieved the defendant of liability. Custom Leasing, Inc. v. Texas Bank & Trust Co., 516 S.W.2d 138, 144 (Tex. 1974).

[4]The record is mixed with respect to the extent the Bank was negligent in allowing Montgomery and Berkich to take over the Bank's operations prior to the completion of the sale and permitting large loans to be disbursed without board approval. For its part, the Bank presents evidence that certain Bank employees worked diligently to procure security for the loan to Wilson, but were thwarted by the illegal conspiracy among the bank president, Montgomery, and Berkich -- some of which activity CNG is alleged to have known about.

9

are indeed considerations for the jury; if the jury finds that the Bank's actions constituted negligence but that the Bank presents a cognizable claim, it will have to take that degree of unclean hands into account and weigh it against the proved misconduct of CNG when determining whether the amount (if any) of the Bank's loan should be returned to it.[5]

It should be noted, however, that the unclean hands defense is inapplicable altogether where the plaintiff's sins do not affect or prejudice the defendant. See, e.g., Rodgers v. Tracy, 242 S.W.2d 900, 905-06 (Tex. App. -- Amarillo 1951).[6] The Bank points to the fact that CNG gained nearly $4 million from the deal with Wilson and ended up retaining its subsidiary companies. It argues that CNG stumbled into a significant windfall and any negligence on the part of the Bank only hurt the Bank itself; in short, the Bank

_____

[5]The parties dispute the degree of wrongdoing that must be shown before a plaintiff's actions render his hands "unclean." CNG argues that a conscious decision not to investigate a potential mistake is enough to defeat the Bank's claim. See Gulf Oil, 322 F.2d at 32. The Bank argues that mere negligence is insufficient: "[O]ne who by innocent mistake delivers his property to another -- no matter how stupid or negligent he may have been in doing so -- cannot be said to have such unclean hands as to bar him from demanding the return of his property or its value." Ligon, 428 S.W.2d at 437. Regardless of the degree of wrongdoing required, the disputes surrounding the actions of Bank employees, the Bank board, CNG, and the con-artists -- and the effect they have on the equities to be weighed in resolving the claim here -- all present material questions of fact that should be decided by the jury.

[6]See also Gulf Oil, 322 F.2d at 32 ("It is not every negligence that will stay the hand of the court . . . . Even a clearly established negligence may not of itself be sufficient ground for refusing relief, if it appears that the other party has not been prejudiced thereby.") (quoting Edwards, 118 S.W. at 576).

10

argues that its alleged negligence did not prejudice CNG because CNG suffered no damage from the loan the Bank made to Wilson. On the other hand, CNG asserts that Wilson crippled Fi-Scrip and Finity when he controlled them. It claims they were saddled with RICO, constructive trust, and UCC-1 claims against substantially all of their assets. Thus we cannot, as a matter of law, say that either argument prevails; it is for the jury to consider these facts and to determine questions of unjust enrichment.

CNG further argues that there can be no claim for money had and received without some affirmative inequitable conduct by the defendant. In support of this proposition it cites Heldenfels Bros., Inc. v. City of Corpus Christi, 832 S.W.2d 39, 41-42 (Tex. 1992) and Tex. Jur. Restitution & Constructive Trusts § 6 (3d ed. 2003). While both of these sources do indicate that a money had and received claim can result from a defendant's duress, fraud, or undue influence, they do not hold that the equitable claim can only arise in the context of reprehensible conduct by the defendant. Other, less insidious acts can serve as the basis for the claim.

For example, property stolen from the plaintiff and transferred to a third party for consideration and received in good faith might still be recovered via an analogous equitable restitution action. See, e.g., Tri-State Chemicals, Inc. v. Western Organics, Inc., 83 S.W.3d 189, 195 (Tex. App. -- Amarillo 2002). Even where money is transferred instead of personalty, a plaintiff need not show that the defendant acquired the money

11

through fraud or duress in order to bring a money had and received action; all that a defendant need show is a lack of good faith in the acceptance of the stolen or pilfered funds. See, e.g., Sinclair Houston Fed. Credit Union v. Hendricks, 268 S.W.2d 290, 295 (Tex Civ. App. -- Galveston 1954).

The facts suggest that it will not be a simple matter to determine whether CNG accepted the Bank's money from Wilson in good faith. The record contains evidence that CNG knew Wilson was a felon and a fraud and had no legitimate way of obtaining the money to pay for CNG's failing subsidiaries. The fact that CNG is alleged to have raised the asking price for the subsidiaries upon discovering that Wilson was a fraud might suggest that CNG entered into the transaction in less than good faith. Thus there is a genuine question of fact concerning CNG's good faith, which is yet another issue that should be left for the jury.

Finally, CNG argues that CNG's change of position upon its receipt of the Bank's funds -- the release of its interests in Finity and Fi-Scrip -- precludes the Bank's recovery. See Greer v. White Oak State Bank, 673 S.W.2d 326, 329 (Tex. App. 1984); Aetna, 186 S.W.2d at 842 (as between equally situated parties, the law favors the one changing position in reliance on payment). Yet this defense again depends on good faith, which, at least according to substantial evidence, may have been lacking. See Equilease Corp. v. Hentz, 634 F.2d 850, 853 (5th Cir. 1981) ("It is patently unfair to require an innocent payee who has received and used the money to

satisfy a debt to repay the money."); Aetna, 186 S.W.2d at 842. Change of position is but one more factor to consider in the overall balancing of equities, and in the determination of who in good conscience is the rightful owner of the money.

In sum, the material issues of fact raised with respect to this money had and received action require a fact-finder to determine who should rightly claim the money wrongfully obtained from the Bank. Courts are naturally hesitant to return money to plaintiffs when both parties are at more or less equal fault; hence we have the equitable defenses such as unclean hands. Nevertheless, in this case there are genuine questions of fact to be resolved in determining the equities that might require CNG to return money to the Bank. The district court's judgment as a matter of law on the money had and received claim therefore constitutes error.

B

We now turn to the judgment as a matter of law with respect to the fraud claim. The district court held that there was no fiduciary relationship between CNG and the Bank that would have required disclosure of Wilson's fraud, that there were no misrepresentations or material omissions by CNG to the Bank, that Wilson had not committed fraud against the Bank, and that there was neither evidence of a common scheme between Wilson and CNG nor evidence that CNG aided and abetted Wilson.

13

The Bank argues that the district court erred because a fraud claim can be based upon the mere showing that CNG was aware of Wilson's fraud and accepted its proceeds. "The partaking of the benefits of a fraudulent transaction makes the participants principals and liable as such." <u>Five Star Transfer & Terminal Warehouse Corp. v. Flusche</u>, 339 S.W.2d 384, 387 (Tex. App. 1960); <u>see</u> <u>also</u> <u>Corpus Christi Area Teachers Credit Union v. Hernandez</u>, 814 S.W.2d 195, 202 (Tex. App. 1991).

Yet this basis for a finding of fraud was never raised in the trial court. The Bank did not mention knowing receipt as a basis for fraud in its opening statements or proposed jury instructions, nor in opposition to CNG's Rule 50 motion. As such, the argument is waived and we cannot find that the district court erred in granting judgment as a matter of law on the fraud claim.[7]

### III

In sum, the district court, in granting judgment as a matter of law in favor of CNG for the reasons enumerated <u>supra</u>, got it all right except with respect to its ruling on unclean hands. It concluded that the evidence showed that the Bank had unclean hands,

---

[7]Even if the knowing receipt argument were properly preserved, Wilson did not defraud the Bank; the record shows no misrepresentations to the Bank that the Bank relied upon. Although Wilson told Montgomery and Berkich that he planned to use the non-existent credit card accounts as collateral, he admitted that the credit card accounts did not exist. Moreover, the Bank (in the control of the criminal conspiracy) was going to lend the money to Wilson regardless of any collateral. Without an underlying fraud, CNG could not be derivatively liable for the knowing acceptance of fraudulent benefits.

14

and that finding may not be incorrect.  The error was in concluding that unclean hands was an absolute bar to recovery on the money had and received claim; the disputed facts require, for the reasons we have addressed in this opinion, that this claim be submitted to the jury, under proper instructions, for its determination. Accordingly, the judgment of the district court is AFFIRMED with respect to the fraud claim, REVERSED with respect to the money had and received claim, and REMANDED for further proceedings not inconsistent with this opinion.

MOTION TO STRIKE REPLY BRIEF DENIED AS MOOT; AFFIRMED in part; REVERSED in part; REMANDED.