# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

———

No. 18-10755

———

MIDWESTERN CATTLE MARKETING, L.L.C.,

Plaintiff - Appellant

v.

LEGEND BANK, N. A.,

Defendant - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

March 3, 2020

Lyle W. Cayce
Clerk

———

Appeal from the United States District Court
Northern District of Texas, Fort Worth
USDC No. 4:17-CV-375

———

Before BARKSDALE, STEWART, and COSTA, Circuit Judges.[1]

PER CURIAM:*

The pending petitions for panel rehearing are hereby DENIED. The panel opinion, *Midwestern Cattle Mktg., L.L.C. v. Legend Bank, N.A.*, —— Fed. Appx. ——, 2019 WL 6834031 (5th Cir. Dec. 13, 2019), is WITHDRAWN, and the following is substituted:

---

[1] Judge Costa concurs in the judgment only.

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-10755

This diversity action stems from a check-kiting scheme in North Texas. Plaintiff-Appellant Midwestern Cattle Marketing, L.L.C. ("MCM") appeals the two summary judgment rulings in favor of Defendant-Appellee Legend Bank, N.A. ("Legend"). For the reasons stated herein, we AFFIRM in part and REVERSE and REMAND in part.

## I.

At the heart of this action is a checking-kiting scheme[2] within the livestock industry that grew to be "one of the largest cattle fraud cases in Texas history."[3]

Tony Lyon was the perpetrator of this fraudulent scheme that eventually caused MCM to go out of business. MCM was a cattle brokerage company in the business of buying cattle from producers, picking the cattle up from producers, and delivering the cattle to a buyer for a commission. Jason O'Connell and his uncle operated MCM. During the relevant period, MCM banked with Points West Bank ("Points West").

To facilitate the check-kiting, Tony Lyon used his parents', Owen and Monna Lyon (the "Lyons")[4], business account with Legend. The bank account (the "Lyons' account") was opened at Legend in 2005 at Legend's Decatur, Texas, branch office. The Lyons' account was used for the Lyons' ranching

---

[2] Check-kiting is a fraudulent scheme designed to trick banks into honoring checks drawn against an account with insufficient funds and extending a line of credit to honor that check on the accountholder's behalf. *United States v. Frydenlund*, 990 F.2d 822, 824 (5th Cir. 1993) (citations omitted).

[3] Natalie Posgate and Mark Curriden, *Jack Co. Family Hit with $23M Cattle Fraud Verdict*, THE TEXAS LAWBOOK (Jan. 24, 2017), https://www.bellnunnally.com/27F299/assets/files/Documents/1-24-17%20-%20The%20Texas%20Lawbook%20-%20Trowbridge%20and%20Cheek.pdf.

[4] To be clear, this shorthand reference only includes Owen and Monna Lyon, not Tony Lyon.

No. 18-10755

company, Lyon Farms. During the relevant period, Brennan Williams was the branch president.[5]

Tony Lyon assisted his parents with Lyon Farms, but the record is unclear how much assistance Tony Lyon provided in operating the business.[6] Brennan Williams and other Legend employees were aware that Tony Lyon helped with the Lyons' cattle business. There is no evidence indicating Brennan Williams and other Legend employees were aware that Tony Lyon had access or was otherwise using the Lyons' account for fraudulent purposes. Brennan Williams testified, in a 2017 trial[7], that he met and communicated with Tony Lyon a handful of times, once at a Decatur Livestock Market and a "time or two" at the branch office.[8]

## A.

## MCM's and Tony Lyon's Business Relationship

---

[5] Brennan Williams and his father have also engaged in a cattle transaction with Owen Lyon. Brennan Williams testified by deposition twice regarding this cattle purchase. Initially, he testified that he was unaware of this cattle agreement with Owen Lyon, and he later recanted that deposition testimony in a subsequent deposition and acknowledged the transaction.

[6] MCM's first amended complaint states that Tony Lyon operated the business and Owen Lyon was only a "part time rancher". However, the affidavits of Tony Lyon, Owen Lyon, and Monna Lyon do not acknowledge that Tony Lyon was involved in Lyon Farms and Brennan Williams testified, in a 2017 trial (*see*, *infra*, Sect.II), that Owen Lyon informed him that Tony Lyon "had been helping him a time or two".

[7] He testified in a related case, *Midwestern Cattle Marketing, LLC v. Tony Lyon d/b/a Lyon Farms, Owen Lyon, and Manna Lyon*, Case No. 15—07—061 in the 271st Judicial District Court of Jack County, Texas. *See*, *infra*, Sect.II.

[8] MCM points to several dozen phone records to indicate that Brennan Williams and Tony Lyon frequently communicated. Upon review, only phone numbers are listed in these records. There is no verification that these numbers belong to Brennan Williams or Tony Lyon. The records that contain the actual text messages only show several messages that reference Owen Lyon. Moreover, no testimony corroborates this texting history between them. Because there is nothing more to suggest that these individuals communicated often, we do not reach the same conclusion as MCM.

No. 18-10755

Tony Lyon was in the business of buying, selling, and grazing cattle. In 2002, he was convicted of making a false statement to a banking institution, Bank of America ("BOA"), concerning cattle loans. The court sentenced him to thirty-seven months in prison and awarded BOA just over $6 million in restitution. Tony Lyon's affidavit stated that he resumed running his independent cattle business after his release from prison.

In July 2011, at a sale barn in Graham, Texas, Jason O'Connell and Tony Lyon met and developed a business relationship—which led to an agreement where Tony Lyon would buy cattle for MCM.[9] Using the Lyons' account,[10] Tony Lyon bought cattle from local ranchers and sale barns to sell to MCM. MCM or Tony Lyon would then find a buyer for the cattle and would split the profits. From 2011 to 2014, Tony Lyon and MCM completed dozens of cattle sales without incident.

According to Jason O'Connell's affidavit, as the business relationship progressed, Tony Lyon informed Jason O'Connell of his previous conviction in defrauding BOA. Jason O'Connell's knowledge of Tony Lyon's conviction did not deter or otherwise hinder MCM's business dealings with Tony Lyon. According to Jason O'Connell, he believed in giving "second chances."

B.

The Exchange of Checkbooks Leads to Check-Kiting

---

[9] There is conflicting affidavit testimony (between Jason O'Connell, his uncle, and Tony Lyon) as to whether the business arrangement involved the Lyons and Lyon Farms. There is no evidence of MCM directly communicating with Owen or Monna Lyon in facilitating this engagement. In turn, we presume that the arrangement only involved Tony Lyon and MCM.

[10] Originally, Tony Lyon used his First Financial Bank account to facilitate cattle transactions, but BOA soon levied that account. Thus, in an effort to avoid the BOA "interference," Tony Lyon used the Lyons' account.

To accelerate the cattle transactions and transfer of funds, Tony Lyon (with authorization from the Lyons) and MCM provided each other with pre-authorized checks from their respective banks. MCM provided Tony Lyon with blank Points West checks and an MCM authorized signature stamp, and Tony Lyon (through Monna Lyon's authorization) provided pre-signed Legend checks to MCM. This approach allowed Tony Lyon and MCM to send each other invoices for authorization to fill in the blank checks and deposit them in Points West or Legend (respectively). This arrangement essentially provided Tony Lyon with check-writing control to both accounts.[11]

With this authority, Tony Lyon devised a check-kiting scheme. The scheme involved a fictitious businessman and company, "John George" and George Cattle Company ("GCC"). Tony Lyon informed MCM that he developed a relationship with John George and portrayed him to be a wealthy businessman interested in making cattle investments.

Tony Lyon began to falsely claim to purchase cattle using MCM's line of credit, then submitted fake invoices to MCM, and would afterward state that he resold the cattle to GCC. After brokering this purported deal, Tony Lyon would have his mother, Monna Lyon, authorize a Legend check to MCM for the line of credit and profit on the GCC transaction. Tony Lyon would have this Legend check issued with the full understanding that the Lyons' account had insufficient funds to cover the check. But shortly thereafter, Tony Lyon would receive permission from MCM to deposit a pre-authorized Points West check for additional credit to purchase more cattle. That additional credit would cover the previously issued check payable to MCM. In essence, these

---

[11] The record does not reflect that the Lyons informed Legend of Tony Lyon's new authority vis-à-vis the Lyons' account. The same can be said about Points West as it also was not informed of Tony Lyon's authority in issuing these Points West checks with MCM's signature stamp.

two accounts were exchanging and drawing checks on each other, so when Points West processed a check and sought payment from Legend, the payee bank, there was sufficient provisional credit in the Lyons' account to cover, based on a recently deposited Points West check.

Over the span of the check-kiting scheme (between late 2014 through June 2015), a cascade of hundreds of checks rebounded back and forth between the Lyons' account and the MCM's Points West account.

## C.

### Legend's Oversight of the Lyons' Account and the Scheme's Collapse

Nothing in the record suggests that Legend conspired with or assisted Tony Lyon in devising and executing this check-kiting scheme. The frequent withdrawals and deposits within the Lyons' account would often incur overdrafts and negative balances to the Lyons' account. Legend understood that the increase was due to business dealings with MCM. And in the event of an overdraft, Brennan Williams, the branch president, would advance provisional credit to the Lyons' account. The overdrafts and provisional credits varied from as little as $152,000.00 to $4.4 million over the course of four months.

As the volume of transactions escalated, Legend's internal systems (which consist of several check fraud detection monitoring programs) began alerting Legend about the Lyons' account activities as early as January 27, 2015. The alerts included red flags for check-kiting activity and overdraft insufficient notices. Despite the fraud detection system notifications, Legend did not report such alerts or otherwise cease advancing its lines of credit until June 26, 2015.

On that date, Points West sought payment from Legend for a $5 million check payable to MCM. At the time, the Lyons' account only contained the credit that Legend floated, and Legend was still waiting on Points West to

No. 18-10755

honor several MCM checks payable to the Lyons. Considering the risks in honoring the $5 million check when the Lyons' account only contained provisional credit, Legend placed a stop payment on the check and returned it to Points West for insufficient funds. This caused the scheme to collapse, and because Legend was the first bank to act and not honor a check, Legend did not lose any money in this scheme. In contrast, MCM sustained significant loss and went out of business in June 2015.

## II.

Considering the foregoing, MCM filed a lawsuit against Tony Lyon, Lyon Farms, and Owen and Monna Lyon that resulted in a jury trial verdict in MCM's favor totaling over $23 million. In a separate criminal matter, Tony Lyon subsequently pleaded guilty to, *inter alia*, fraud and the check-kiting scheme. He was sentenced to 10 years in prison and ordered to pay over $5 million in restitution.

In May 2017, MCM initiated this action against Legend because it maintains that Legend profited from and was complicit in the check-kiting scheme. MCM sought recovery for fraudulent transfer (Count One), money had and received (Count Two), unjust enrichment (Count Three), common law fraud (Count Four), aiding and abetting (Count Five), conspiracy (Counts Six and Seven), violation of the garnishment statute (Count Eight), negligent misrepresentation (Count Nine), violations of the Uniform Commercial Code (Count Ten), and negligence, negligence per se, and gross negligence (Count Eleven). MCM's prayer of relief included exemplary damages and attorney's fees (Counts Twelve and Thirteen).

Legend filed a motion for summary judgment. The district court granted the motion in part as to counts two through twelve. In a supplemental order, it granted summary judgment on the remaining claim. MCM timely appealed

No. 18-10755

the district court's summary judgment rulings and its evidentiary ruling excluding MCM's three experts.

## III.

"We review a [district court's order] grant[ing] summary judgment *de novo*, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor."[12]  *Pierce v. Dep't of U.S. Air Force*, 512 F.3d 184, 186 (5th Cir. 2007). "Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Lyda Swinerton Builders, Inc. v. Okla. Sur. Co.*, 903 F.3d 435, 444 (5th Cir. 2018) (quoting FED. R. CIV. P. 56(a)).

This diversity action relates to check-kiting, overdrafts, and provisional credits. Article 4 of the Uniform Commercial Code ("UCC"), found in Texas Business and Commerce Code Chapter 4, is the governing body for bank deposits and collections, and it serves as the guidepost for our analysis. TEX. BUS. & COM. CODE § 4.101, *et seq.*; *Am. Airlines Emps. Fed. Credit Union v. Martin*, 29 S.W.3d 86, 91 (Tex. 2000) ("Article 4 of the UCC . . . establishes the rights and duties between banks and their customers regarding deposits and collections.").

"We have jurisdiction over this case owing to the diversity of the parties, so we apply Texas substantive law. [citation] In doing so, we are bound by the decisions of the Supreme Court of Texas." *DeJoria v. Maghreb Petroleum Expl., S.A.*, 935 F.3d 381, 387 (5th Cir. 2019) (citing *Comm'r v. Bosch's Estate*, 387 U.S. 456, 465 (1967) and *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).

### Money "Had and Received" and Unjust Enrichment

---

[12] Except for the district court's evidentiary ruling to exclude expert testimony and application of an equitable defense, each issue shall be reviewed de novo.

No. 18-10755

In dismissing MCM's money had and received claim, the district court determined that Legend properly asserted an unclean hands defense and that MCM failed to demonstrate ownership.[13] We disagree.

A legal "action for money had and received arises when [a party] obtains money which in equity and good conscience belongs to the plaintiff." *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no pet.). Money had and received claims "'belong[] conceptually to the doctrine of unjust enrichment.'" *Edwards v. Mid—Continent Office Distribs., L.P.*, 252 S.W.3d 833, 837 (Tex. App.—Dallas 2008, writ denied) (quoting *Amoco*, 946 S.W.2d at 164). Specifically, it is "an equitable doctrine applied to prevent unjust enrichment." *Miller-Rogaska, Inc. v. Bank One, Tex., N.A.*, 931 S.W.2d 655, 662 (Tex. App.—Dallas 1996, no writ), *superseded on other grounds by* TEX. BUS. & COM. CODE § 3.419. Unjust enrichment results from the "failure to make restitution [of benefits] under circumstances that give rise to an implied or quasi-contractual obligation to return those benefits." *Edwards*, 252 S.W.3d at 837 (citations omitted).[14]

---

[13] Legend also maintains that money had and received claims have been supplanted by the UCC. This position contradicts precedent. We have held that the UCC did not displace Texas's money had and received claim, and Texas courts have adopted our reasoning. *See Peerless Ins. Co. v. Texas Commerce Bank-New Braunfels, N.A.*, 791 F.2d 1177, 1179–81 (5th Cir. 1986); *see also Stone v. First City Bank of Plano, N.A.*, 794 S.W.2d 537, 543 (Tex. App.—Dallas 1990, writ denied) ("In our view, the opinion of *Peerless* employs sound reasoning, and we adopt it as our own."). Even a conflict between the UCC and a common law claim like money had and received does not necessarily warrant the displacement of the cause of action if the two can be reconciled. *See Coastal Agric. Supply, Inc. v. JP Morgan Chase Bank, N.A.*, 759 F.3d 498, 508 (5th Cir. 2014) ("[T]he conflict between the money had and received claim at common law and [Tex. Bus. & Com. Code] § 3.405 can be resolved without entirely displacing the money had and received claim. Rather, the money had and received claim as applied in this situation must simply incorporate the affirmative defense provided by [Tex. Bus. & Com. Code] § 3.405."). Moreover, Legend does not point to a conflict that would bear on this case.

[14] Legend claims that Texas does not recognize unjust enrichment as a distinct standalone claim. We have held that while unjust enrichment may not be an independent

No. 18-10755

We review application of the unclean hands doctrine for abuse of discretion. *Radiator Specialty Co. v. Pennzoil-Quaker State Co.*, 207 F. App'x 361, 362–63 (5th Cir. 2004) (per curiam).[15]   "A district court abuses its discretion if it: (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Combs v. City of Huntington, Tex.*, 829 F.3d 388, 391 (5th Cir. 2016) (quoting *Allen v. C & H Distribs., L.L.C.*, 813 F.3d 566, 572 (5th Cir. 2015)).

The equitable defense of unclean hands is based on "the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." *Rogers v. McDorman*, 521 F.3d 381, 385 (5th Cir. 2008) (internal quotation omitted).   "[T]he unclean hands defense is inapplicable altogether where the plaintiff's sins do not affect or prejudice the defendant." *Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 842 (5th Cir. 2004) (citing *Rodgers v. Tracy*, 242 S.W.2d 900, 905–06 (Tex. App.—Amarillo 1951, writ ref'd n.r.e.)).   To dismiss a money had and received claim under an affirmative unclean hands defense, a court should balance "plaintiff's errors of omission or commission . . . against the defendant's unjust acts." *Id.* at 841 (citation omitted).   This defense offsets a plaintiff's recovery like comparative negligence would for a negligence claim.

---

claim in Texas, "[a] party may [still] recover under the unjust enrichment theory . . . ." *Harris Cty. Tex. v. MERSCORP Inc.*, 791 F.3d 545, 561 (5th Cir. 2015) (citing *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992)).   MCM may therefore recover on an unjust enrichment theory as long as it proves that Legend obtained a benefit from MCM "by fraud, duress, or the taking of an undue advantage." *Forbes v. CitiMortgage Inc.*, 998 F. Supp. 2d 541, 553 (S.D. Tex. 2014) (quoting *Heldenfels Bros.*, 832 S.W.2d at 41).

[15] As mentioned, "[w]e review a grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205–06 (5th Cir. 2007) (citing *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000)). However, because unclean hands "is an equitable doctrine, and the decision whether to invoke it [is] within the court's discretion, we review for abuse of discretion" the district court's decision to invoke it. *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 (5th Cir. 1999) (discussing standard of review of a determination of judicial estoppel, another equitable doctrine) (citation omitted).

*Bank of Saipan*, 380 F.3d at 841.  Indeed, when the defense "sounds in negligence," the issues of the plaintiff's negligence and how much it offsets the defendant's conduct raise fact issues usually appropriate for a jury.  *See id.* at 841–42.

The weighing of the equities is absent from the court's analysis.  The district court merely states that "plaintiff contributed to its own predicament by giving [a convicted felon,] Tony[,] its checkbook and a signature stamp." *Midwestern Cattle Marketing, LLC v. Legend Bank, N.A.*, Case No. 4:17–CV–375–A, 2018 WL 2244339, at *5 (N.D. Tex. May 16, 2018).  In its supplemental order, the district court continues to emphasize that plaintiff's "own actions played a role in the outcome" without balancing the effect this conduct had on Legend.  Absent a balancing of the comparative equities, neither we nor the district court can "say as a matter of law that unclean hands completely bars recovery in this case."  *Id.* at 842.  In failing to properly analyze or otherwise appropriately assess this defense, we hold that this district court abused its discretion.  *See Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 615 (5th Cir. 2018) ("A district court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence.") (internal quotation marks omitted).  For this reason, we reverse and remand MCM's money had and received claim for the district court to properly assess the undisputed facts and the equities of both parties and to determine whether MCM's "sins . . . affect or prejudice" Legend, warranting the application of this defense.  *Bank of Saipan*, 380 F.3d at 842.

Legend's next position is that MCM failed to demonstrate ownership of funds held by Legend, which it asserts is necessary to succeed on a claim for money had and received.  This argument rests on a technical element, but the money had and received claim is "less restricted and fettered by technical rules and formalities than any other form of action." *Staats v. Miller*, 243 S.W.2d

686, 687 (Tex. 1951) (internal quotations omitted). "[A]ll that a 'plaintiff need show [to prove a claim for money had and received] is that defendant holds money which in equity and good conscience belongs to him.'" *Villarreal v. First Presidio Bank*, 283 F. Supp. 3d 548, 557 (W.D. Tex. 2017) (citing *Staats*, 243 S.W.2d at 687). That showing is in dispute here in light of MCM's evidence and position claiming that it is the rightful owner of the disputed funds. *See*, *infra*, Sect.III (Texas Uniform Fraudulent Transfer Act ("TUFTA") Claim). Thus, to the extent the district court granted summary judgment here for failure to demonstrate ownership, these claims are reinstated and remanded.

### The Constructive Trust Remedy

"A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment." *Hubbard v. Shankle*, 138 S.W.3d 474, 485 (Tex. App.—Fort Worth 2004, pet. denied) (citation omitted). It is not an independent cause of action under Texas law. *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010). "To obtain a constructive trust, the proponent must prove (1) the breach of a special trust, fiduciary relationship, or actual fraud, (2) unjust enrichment of the wrongdoer, and (3) tracing to an identifiable res." *In re UTSA Apartments 8, L.L.C.*, 886 F.3d 473, 488 (5th Cir. 2018) (quoting *Gray v. Sangrey*, 428 S.W.3d 311, 315 (Tex. App.—Texarkana 2014, pet. denied)).

MCM's money had and received and unjust enrichment theories are premised on the fact that the Lyons' account contained fraudulently obtained funds that MCM claims to own. Assuming the court or a jury finds this to be the case, then the district court will determine whether to impose a constructive trust.

We note that the district court already determined that this is not the type of case where a constructive trust is appropriate because there is no specific identifiable res. We disagree. First, paragraphs 78 and 81 of the First Amended Complaint identify four specific alleged payments to trace. *See*

No. 18-10755

RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 59(1) & cmt. c, illus. 1 (2011); *Cf. In re Hayward*, 480 S.W.3d 48, 52–55 (Tex. App.—Fort Worth 2015, no pet.) (concluding imposition of a constructive trust was improper where funds were not traceable). Second, it is premature to make this determination because "a constructive trust is a remedy generally contemplated by the court at the remedies phase of a legal proceeding, only after an entitlement to judgment has been ascertained." *GE Capital Commercial, Inc. v. Wright & Wright, Inc.*, No. 3:09–CV–572–L., 2009 WL 5173954, at *10 (N.D. Tex. Dec. 31, 2009). We therefore reinstate this remedy to be evaluated after judgment is determined (either at summary judgment or trial).

<u>Negligence and Gross Negligence Claims</u>

The district court granted summary judgment against MCM's negligence theories (*i.e.*, negligence, negligence per se, and gross negligence) because (1) Legend did not owe a duty to MCM, a non-customer; and (2) MCM's injury is purely economic, precluding recovery under the economic loss rule. The first point warrants summary judgment.

Negligence encompasses four key elements—the first, owing a duty to the plaintiff, is the central issue here. *Mission Petroleum Carriers, Inc. v. Solomon*, 106 S.W.3d 705, 710 (Tex. 2003). "The existence of a duty is a question of law." *Id*.

MCM asserts Legend owed it a duty because "if a bank knows or has reason to know that its customer is perpetrating a fraud, the bank has a duty not to continue to enable the fraud". [16]

---

[16] MCM points to several cases to support its argument that it is owed a duty, but the problem with each case is that it advances a responsibility owed to fiduciary parties or trust beneficiaries, not unaffiliated non-customers. *Grebe v. First State Bank of Bishop*, 150 S.W.2d 64, 68 (Tex. 1941) (stating that a bank may come under a legal duty to protect the third parties when "[t]he bank . . . with full knowledge that the funds on deposit belonged in

No. 18-10755

MCM's position is foreclosed by Texas law, which maintains that, in the absence of a fiduciary or confidential relationship, a bank owes no duty to a person with whom the bank has not dealt and otherwise has no relationship. *Guerra v. Regions Bank*, 188 S.W.3d 744, 747 (Tex. App.—Tyler 2006, no pet.) ("Because he was not a Regions customer and had no other relationship with Regions, as a matter of law Regions owed no duty to Appellant."); *Marlin v. Moody Nat'l Bank, N.A.*, 248 F. App'x 534, 540 (5th Cir. 2007) ("Further, a bank owes a duty of care to customers but not third parties.") (citing *Guerra*, 188 S.W.3d at 747). Because MCM did not "deal" with the bank and because its only relevant relationship was with Tony Lyon—not Legend—the alternative "fiduciary or confidential relationship" is absent.

For these reasons, we affirm the dismissal of MCM's negligence claims. We also affirm the district court's ruling as to MCM's gross negligence claim as it likewise fails to satisfy the duty element. *Austin v. Kroger Tex. L.P.*, 746 F.3d 191, 196 n.2 (5th Cir. 2014) ("To recover for gross negligence in Texas, a plaintiff must satisfy the elements of an ordinary negligence . . . claim.").

<u>Conspiracy Claim</u>

MCM's conspiracy claim posits that Legend conspired with Tony Lyon in furtherance of the check-kiting fraud scheme. MCM appears to rely on the check-kiting scheme as the underlying basis for the conspiracy claim.[17]

---

part to the minor daughter, knowingly permitted the surviving widow [the fiduciary] to check them out of the bank and appropriate them to her own personal use and benefit."); *Steere v. Stockyards Nat. Bank*, 256 S.W. 586, 590–91 (Tex. Comm'n App. 1923) (precluding the bank from offsetting the depositor's debts because the bank was aware that the account contained trust funds); *U.S. Fid. & Guar. Co. v. Adoue & Lobit*, 137 S.W. 648, 652–53 (Tex. 1911) (holding a bank liable for allowing a fiduciary to misappropriate the trust funds that were held in the bank to pay the trustee's personal debts).

[17] Conspiracy liability can also be premised on an underlying cause of action or wrongful act—here, being fraud vis-à-vis the check-kiting scheme. *In re Enron Corp. Sec., Derivative & Erisa Litig.*, 762 F. Supp. 2d 942, 972 (S.D. Tex. 2010) ("Conspiracy is a derivative tort because recovery is not based on the conspiracy, i.e., the agreement, but on the injury from the underlying tort, here allegedly fraud.").

No. 18-10755

Because MCM failed to adduce evidence of genuine disputes of material fact suggesting Legend and Tony Lyon were co-conspirators, the district court granted Legend's summary judgment motion, dismissing this claim. We affirm.

In Texas, civil conspiracy is a theory of liability that allows an injured party to recover from a tortfeasor's coconspirators. *See Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 141–42 (Tex. 2019). "[A] civil conspiracy claim is connected to the underlying tort and survives or fails alongside it." *Id.* at 141. In proving conspiracy, there must be proof of a combination of two or more persons working in concert to accomplish an unlawful purpose. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 583 (Tex. 2001). The Texas Supreme Court recently defined the elements of civil conspiracy as "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Agar*, 580 S.W.3d at 141–42 (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)).

MCM seeks to rely on circumstantial evidence. According to MCM, genuine issues of dispute exist as to Legend's intent, overt actions, and the meeting of the minds. MCM points to "Legend's internal fraud detection devices generating repeated check-kiting warnings, Legend's president manually overriding them then advancing substantial sums [of credit] to cover seven-figure overdrafts," and Brennan Williams and his father executing the cattle deal with Owen Lyon (that Brennan recanted after initially denying). MCM avers that, under this record, a reasonable jury could conclude that Legend was a willing participant in the check-kiting scheme with Tony Lyon, precluding summary judgment.

15

We disagree because this circumstantial evidence does not raise to a genuine issue of material fact as to whether Legend and Tony ever reached a "meeting of the minds" over a joint objective to execute this check-kiting scheme. *Cf. Schlumberger Well Surveying Corp. v. Nortex Oil & Gas*, 435 S.W.2d 854, 858 (Tex. 1968) ("[P]roof of a conspiracy may be, and usually must be made by circumstantial evidence, [citation] but vital facts may not be proved by unreasonable inferences from other facts and circumstances".) (citations omitted).

"[A] meeting of the minds on the object or course of action" is one of the vital elements required to establish a civil conspiracy. *Id.* at 857 (internal quotation marks and citation omitted). Here, there is no circumstantial evidence of two or more parties pursuing a common unlawful objective such as (1) Legend being aware that Tony Lyon was intentionally defrauding MCM; (2) Tony Lyon informing Legend of essential details to the check-kiting scheme, in particular that GCC was fictitious; (3) Brennan Williams directly benefitting from Tony Lyon's fraudulent scheme; or (4) Legend being aware that Monna Lyon provided Tony Lyon with pre-authorized checks. MCM instead underlines Legend's internal fraud alert system and Brennan Williams overriding such alerts. This is proof of Legend's day-to-day business operations and Brennan Williams' day-to-day employment duties, not a tacit meeting of the minds connected to Tony Lyon. *Cf. Chu v. Hong*, 249 S.W.3d 441, 447 (Tex. 2008) ("[I]nferring an agreement to the ultimate injury generally arises 'from joint participation in the transactions and from enjoyment of the fruits of the transactions.'") (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 582 (Tex. 1963)). MCM's reliance on Brennan's cattle transaction with Owen Lyon is equally unpersuasive because there are no facts that this cattle exchange supported Tony Lyon's unlawful purpose of check-kiting or was otherwise connected to Tony Lyon. We do not see any inferences that can be

drawn beyond Legend's general business operations and an independent cattle transaction involving Brennan Williams and his father. *Brown v. City of Hou., Tex.*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

We therefore affirm the district court's summary judgment ruling to dismiss MCM's conspiracy claim.

### Aiding and Abetting

We agree with the district court's dismissal here but for different reasons as the law has changed since the district court's ruling. MCM contends that several events raise genuine disputes of material fact as to whether Legend intended to enable Tony Lyon's scheme via the Lyons' account. A month after the district court ruled on summary judgment, we handed down a decision stating that aiding and abetting does not exist as a distinct cause of action in Texas. *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prod. Liab. Litig.*, 888 F.3d 753, 781–82 (5th Cir. 2018). In *DePuy*, the district court "exceeded its circumscribed institutional role" by recognizing a cause of action for aiding and abetting under Texas law. 888 F.3d at 781. We noted that the "Texas Supreme Court 'has not expressly decided whether Texas recognizes a cause of action for aiding and abetting,'" and "[w]hen sitting in diversity, a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts." *Id.* (citations omitted). Therefore, we cannot recognize a claim that the Texas Supreme Court has yet to expressly adopt. *Id.* For these reasons, we affirm the dismissal of the aiding and abetting claim.

### Texas Uniform Fraudulent Transfer Act ("TUFTA") Claim

MCM contends that the Lyons, the debtors, fraudulently transferred funds to Legend. According to MCM, the district court erroneously concluded that the deposits into the Lyons' account were not a potential fraudulent

transfer under TUFTA. In its supplemental order, the district court dismissed this TUFTA claim because the deposits at issue were based on MCM checks that were not property of the debtors, the Lyons. Rather, the transferred property at issue allegedly belonged to MCM, not the debtors—which MCM admitted to in the parties' joint pretrial order. We agree with the district court's ruling.

TUFTA allows the recovery of property transfers made "with actual intent to hinder, delay, or defraud any creditor of the debtor." TEX. BUS. & COM. CODE § 24.005(a)(1). "A fraudulent conveyance [under TUFTA] is a transfer by a debtor with the intent to hinder, delay, or defraud his creditors by placing the debtor's property beyond the creditor's reach." *Nobles v. Marcus*, 533 S.W.2d 923, 925 (Tex. 1976). The debtor's property is also known as an asset. TEX. BUS. & COM. CODE § 24.002(2) (stating that "[a]sset means property of a debtor") (internal quotation marks omitted); *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 204–05 (Tex. App.—Houston [1st Dist.] 2014, pet. denied) ("An asset is the property of the debtor, which includes anything that may be the subject of ownership.") (internal quotations and citation omitted). "Without an asset, no fraudulent transfer can occur under [TUFTA]." *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 341 (Tex. 2009). In turn, the transferred property must belong to the debtor.

Here, in the parties' joint-pretrial order, MCM admitted that it owned the transferred property at issue. MCM states that the "funds [transferred] never belonged to the Lyons", rather "the funds in the Legend account belonged to [MCM]." Said differently, MCM seeks to recover for the transfers of its assets, not the debtors' (the Lyons'). Because MCM disclosed that the transfers at issue were not debtor property, the district court rightfully dismissed this claim *sua sponte*. *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177 (5th Cir.

No. 18-10755

2006) (stating that the court has the authority to consider the sufficiency of a complaint and "dismiss an action on its own motion 'as long as the procedure employed is fair'") (quoting *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998)).

IV.

We separately review MCM's appeal to the district court's order excluding MCM's expert testimony.

When navigating the expert-qualification process, the district court has "[w]ide latitude." *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012) (stating that the district court was within its wide discretion in making its expert testimony rulings). Therefore, "[w]e review the district court's determination of admissibility of expert evidence . . . for abuse of discretion." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002).

"A witness who is qualified as an expert . . . may testify in the form of an opinion or otherwise if," among other things, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702. "[W]hether the situation is a proper one for the use of expert testimony is to be determined on the basis of assisting the trier [of fact]." *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 449 (5th Cir. 1990) (internal quotation marks omitted).

The district court's decision to exclude expert testimony was based on the rationale that MCM had one remaining claim for fraudulent transfer under TUFTA—which the court later dismissed in a supplemental order. We have now affirmed the dismissal of the fraudulent transfer claim and only reinstate MCM's money had and received claim.   The balancing of the equities required to evaluate money had and received and unclean hands can "sound[] in negligence" too. *See Bank of Saipan*, 380 F.3d at 841–42.  In turn, because MCM's banking industry experts were to opine on MCM's negligence claims

19

(as the district court mentioned), it is necessary for the court to consider whether these experts could help a factfinder decide the money had and received claim. We therefore remand to the district court to make this expert testimony assessment in the first instance.

## V.

For the foregoing reasons, we REVERSE the district court's summary judgment order dismissing MCM's claim for money had and received and rejecting MCM's request for the imposition of a constructive trust. We REMAND for further proceedings consistent with this opinion as it relates to that claim and remedy. We also REMAND for the district court to consider whether MCM's previously-designated expert witnesses should be allowed to testify in relation to the money had and received claim. The district court's ruling is otherwise AFFIRMED.

Accordingly, the district court's summary judgment orders are AFFIRMED in part, and REVERSED and REMANDED in part.